267 F.3d 1132 (D.C. Cir. 2001)
 Landmark Legal Foundation, Appellant
v.
Internal Revenue Service, Appellee
 No. 00-5344
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued September 12, 2001
Decided October 12, 2001
 
 Appeal from the United States District Court for the District of Columbia (No. 97cv01474)
 Richard P. Hutchison argued the cause for appellant. With him on the briefs was Mark R. Levin.
 Thomas J. Sawyer, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were Jonathan S. Cohen, Attorney, and Kenneth L. Wainstein, U.S. Attorney.
 Before: Tatel and Garland, Circuit Judges, and Williams, Senior Circuit Judge.*
 Opinion for the Court filed by Senior Judge Williams.
 Williams, Senior Circuit Judge:
 
 
 1
 Early in 1997 there was public controversy over claims that the Internal Revenue Service had selectively audited conservative non-profit organizations in response to requests from outside parties. Seeking to investigate these allegations, Landmark Legal Foundation filed a request under the Freedom of Information Act seeking the following records:
 
 
 2
 [C]opies of any and all documentation (including, but not limited to, paper correspondence, telephonic inquiries and/or electronic communications) evincing requests since January 1, 1992[,] by individuals and/or entities external to the [IRS] for audits or investigations of 501(c)(3) tax-exempt organizations. Please include the names of the individuals and/or entities requesting the audits or investigations and the names of the 501(c)(3) tax-exempt organizations for which audits or investigations were requested. We wish to make clear that we are not asking the IRS to provide information revealing whether, in fact, any of these entities are actually being audited.
 
 
 3
 The request went on to seek documents that would reveal mere inquiries about the tax status of exempt organizations.
 
 
 4
 In the course of the usual back and forth between requester and agency, the IRS released several hundreds of pages of documents but also withheld thousands. On court order, it produced a Vaughn index, see Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), dividing the papers into 20 categories and invoking in support of non-disclosure Exemptions 3 and 6, 5 U.S.C. §§ 552(b)(3) & (6). On the basis of Exemption 3, the district court granted the IRS's motion for summary judgment on all but four categories, as to which it found the IRS affidavits insufficient. See Landmark Legal Foundation v. Internal Revenue Service, 87 F. Supp. 2d 21, 26-27, 29 (D.D.C. 2000). It rejected the Service's invocation of Exemption 6. Id. at 27-28. Finally, it denied most of Landmark's requests for discovery. Id. at 29-30. Landmark filed an appeal, which we dismissed for want of a final order, Landmark Legal Foundation v. Internal Revenue Service, No. 00-5147 (D.C. Cir. June 29, 2000), and then abandoned its requests for the four categories as to which the court had not granted summary judgment. The district court accordingly entered a final judgment on all claims. Reviewing de novo, see DeGraff v. District of Columbia, 120 F.3d 298, 301 (D.C. Cir. 1997), we agree that Exemption 3 is applicable to the disputed documents and we reject Landmark's other claims of error. We need not reach the IRS's contention that the district court erred in rejecting the Exemption 6 defense.
 
 
 5
 * * *
 
 
 6
 Exemption 3 provides that documents need not be released if they are "specifically exempted from disclosure by statute...." 5 U.S.C. § 552(b)(3). The exemption statute invoked by the IRS is 26 U.S.C. § 6103, which provides that "return information shall be confidential." Id. § 6103(a); see also Church of Scientology of California v. IRS, 792 F.2d 146 (D.C. Cir. 1986) (holding that § 6103 is an Exemption 3 statute). Section 6103 then defines "return information" as including:
 
 
 7
 ... a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense.
 
 
 8
 26 U.S.C. § 6103(b)(2)(A) (emphasis added). This definition of "return information" has, in the words of some commentators, "evolved to include virtually any information collected by the Internal Revenue Service regarding a person's tax liability." Allan Karnes & Roger Lirely, Striking Back at the IRS: Using Internal Revenue Code Provisions to Redress Unauthorized Disclosures of Tax Returns or Return Information, 23 Seton Hall L. Rev. 924, 933 (1993).
 
 
 9
 Landmark's original FOIA request may be broken down into three parts: (1) the identities of tax-exempt organizations; (2) the identities of third parties who requested audits or investigations of those organizations; and (3) any other material or information included in those third-party requests.
 
 
 10
 We first note a constructional ambiguity that we will not resolve. Section 6103(b)(2)(A) starts with a long list of specific items (starting with "a taxpayer's identity"), and then refers to "other data," followed by a modifying clause-"received by ... the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability...." 26 U.S.C. § 6103(b)(2)(A). The modifying clause may apply to all the preceding items, or only to "other data." Under the latter reading, Congress would be understood to have thought that the specifically identified information, if in the hands of the IRS at all, should be categorically sheltered from disclosure. Because we must construe the modifying clause for purposes of the third-party identities and the contents of their communications, and under the view we take it would clearly embrace the taxpayer identities, we need not resolve whether taxpayer identities would be covered if for some reason they did not satisfy the modifying clause. See Ryan v. Bureau of Alcohol, Tobacco and Firearms, 715 F.2d 644, 646 n.3 (D.C. Cir. 1983) (also declining to resolve that question).
 
 
 11
 As noted, the statute specifically covers "a taxpayer's identity." Landmark does not claim that an entity's classification as tax-exempt excludes it from that category--a claim that would surely be weak in light of the statute's additional inclusion of "data ... furnished ... with respect to ... the determination of the existence, or possible existence, of liability ... of any person." See Breuhaus v. IRS, 609 F.2d 80, 83 (2d Cir. 1979) (holding that § 6103 applies to information relating to tax-exempt organizations).
 
 
 12
 The remaining two categories--the identities of third parties who requested audits or investigations and the contents of their communications--are covered only if they constitute "[1] data, [2] received by ... the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability...." 26 U.S.C. § 6103(b)(2)(A) (bracketed enumeration added). (The IRS does not claim that any of the contents at issue here might fit any of the categories listed in § 6103 between "taxpayer's identity" and the catch-all reference to "other data.") We address first whether these materials meet the requirements of the modifying clause, then whether they constitute "data."
 
 
 13
 We would owe deference to the IRS's interpretation of § 6103 under Chevron U.S.A. Inc. v. National Resources Defense Council, Inc., 467 U.S. 837 (1984), if the Service had reached the interpretation asserted here in a notice-andcomment rulemaking,a formal agency adjudication, or in some other procedure meeting the prerequisites for Chevron deference stated in United States v. Mead, 121 S. Ct. 2164, 2172-75 (2001). But the Service makes no claim that the interpretation it developed in litigation here arose in any such procedure. Accordingly, we can give its views no more than the weight derived from their "power to persuade." See id. at 2172 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).
 
 
 14
 First, were the third-party identities and the contents of their communications "received by ... the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability"? In Lehrfeld v. Richardson, 132 F.3d 1463 (D.C. Cir. 1998), we found that this language did not resolve "the precise question" whether it covered data received by the IRS in its initial investigation of a party's application for tax-exempt status. Id. at 1467. Under the standards then applied by this court for Chevron deference, however, we found the IRS's conclusion that the language did cover such data reasonable. Id.
 
 
 15
 Chevron being inapplicable here in light of Mead, we must decide for ourselves the best reading of the modifying clause (pretermitting the issue of whether the IRS may later adopt a different--but nonetheless "reasonable"--interpretation). We conclude that indeed the statutory phrase--"the existence, or possible existence, of liability"--naturally encompasses the issue of tax-exemption vel non.
 
 
 16
 But Landmark goes on to question whether these materials were "received by ... the Secretary with respect to a return or with respect to" any issue. In many cases we know little more than that the communications arrived at the IRS, with no indication that it used them in any way or subjected them to anything more than minimal processing. But § 6103 seems deliberately sweeping in this respect, reaching data "received by, recorded by, prepared by, furnished to, or collected by" the Secretary. It appears to take no interest in the Secretary's actual use of the material. To reach Landmark's reading we would have to excise the words "received by" and "furnished to," and to disregard the extremely general character of the connecting phrase--"with respect to."
 
 
 17
 The second issue is whether the identities of the third parties and the contents of their communications are "data." Dictionary definitions, a common start, are rather broad. Webster's Third New International Dictionary 577 (1981) ("datum" [the singular] means "detailed information of any kind"); Oxford English Dictionary (2d ed. 1989) ("facts ... or information"). And in Tax Analysts v. IRS, 117 F.3d 607 (D.C. Cir. 1997), where we tried to distinguish between "factual" and "legal" matters, we observed that "[e]ach of the specific items listed in the beginning of § 6103(b)(2)(A)," including the "taxpayer's identity," are "factual in nature." Id. at 613-14 (emphasis added). Moreover, the catch-all phrase at the end is "other data," suggesting that Congress regarded all the preceding items, including the taxpayer's identity, as data. A third-party complainer's identity seems no less so. Presumably a statement of a "taxpayer's identity" communicates the factual proposition that someone's name is in the IRS files in connection with that person's payment or non-payment of taxes. Similarly, revelation of any thirdparty complainer "identity" expresses the factual proposition that the person identified has communicated with the IRS about the status of a taxpayer or potential taxpayer.
 
 
 18
 The IRS has indulged in what seems to us an inconsistency on this point, as it released to Landmark letters written by representatives and senators (with their names not redacted), typically enclosing a constituent's letter urging that the IRS investigate a tax-exempt organization, or in some cases actually urging the same at the behest of a constituent. When we asked government counsel at oral argument to reconcile these releases with the IRS position here, he was quite tongue-tied. As Skidmore deference looks in part to an agency's consistency, see 323 U.S. at 140 (consistency over time); FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 37 (1981) (treating consistency under Skidmore as embracing logical consistency), this must count against the Service's position. Despite that debit, we think that for the reasons given above the term "data" is correctly understood to cover the identity of third parties who urge the IRS to withdraw or reexamine an entity's tax-exempt status.
 
 
 19
 It remains to consider whether the contents of the third parties' communications were "data." To judge from the letters of congressmen and IRS responses appearing in the Vaughn index, they characteristically assert obviously factual propositions. For example, an IRS letter responding to a senator notes that the senator had forwarded a letter from a constituent complaining that a tax-exempt church had been the "cosponsor of an advertisement 'posing a number of moral questions regarding the candidacy of Bill Clinton.' " Joint Appendix ("J.A.") 84-85. And a representative's letter urges that the IRS "investigate" a constituent's allegations that an organization had "contracted services with a non-profit entity he [the constituent] feels has instituted discriminatory policies which violate the civil rights of minorities." J.A. 91.
 
 
 20
 Of course part (or conceivably all) of some communications may be entirely exhortational. But even such material would be "unique to a particular taxpayer," the factor we used in Tax Analysts to help distinguish between non-disclosable facts and disclosable legal conclusions. See 117 F.3d at 614. Conceivably a court could order redaction of the identities of taxpayers and third parties, and of all assertions of empirical propositions, leaving only the non-cognitive portions to be released. Thus Landmark would receive pieces of paper reading, for example, "I, _______, think that _______ should be audited because _______ [redacted factual proposition thought by the author to be relevant to the entity's exempt status] and because it is a pestilential organization [or similar meaningless pejorative]." But nothing in Landmark's briefs suggests that it meant to request any such a nonsensical document.
 
 
 21
 Our reading of § 6103(b)(2)(A) finds some support in § 6104, which carves out a narrow exception to § 6103 by providing that any tax-exempt organization's application for tax-exempt status and any "paper[s] submitted in support of such application" shall be "open to public inspection." § 6104(a)(1)(A). The presence of this exception suggests that Congress viewed § 6103(b)(2)(A)'s non-disclosure provision as broad enough to encompass any comparable papers, such as ones like those at issue here, which were submitted in opposition to claims of tax-exempt status. Cf. Lehrfeld, 132 F.3d at 1466 (accepting as permissible under Chevron the IRS's conclusion that § 6104(a)(1)(A) was "limited to submissions made by the applicant" itself).
 
 
 22
 Landmark lays great stress on Tax Analysts, but that case held simply that § 6103(b)(2)(A) did not cover certain communications by which the national office of the IRS's General Counsel gave field offices legal advice on specific factual situations. 117 F.3d at 616. The case rested primarily on the distinction between facts, which are "data," and legal analysis, which we held was not. We had no occasion to consider whether propositions that were neither factual nor legal qualified as "data." Nor need we here, as we find no request for completely non-cognitive statements. Certainly the taxpayer-specific character of the entirety of these communications points under Tax Analysts toward their classification as "data." 117 F.3d at 614. Moreover, we note that insofar as Tax Analysts might be thought to have narrowed the concept of "data," it was explicitly driven by the force of 26 U.S.C. § 6110. 117 F.3d at 616. That section requires disclosure of "Technical Advice Memoranda," legal analyses that we said were almost indistinguishable (for these purposes) from the "Field Service Advice Memoranda" that Tax Analysts held were not "data" for purposes of § 6103(b)(2)(A). Id.
 
 
 23
 In closing we note Landmark's argument that the statute protects only "return information," and thus can cover only information that relates to an actual tax return. But this rather wistful point disregards the actual statutory definition, which plainly reaches far beyond what the phrase "return information" would normally conjure up.
 
 
 24
 Thus we agree with the district court that the materials in dispute are exempt from FOIA disclosure under Exemption 3.
 
 
 25
 Landmark makes a number of additional claims. First, it contends that the Vaughn index was inadequately detailed. Given the index's purpose of enabling the court to rule without full disclosure of the documents themselves, Dellums v. Powell, 642 F.2d 1351, 1360 (D.C. Cir. 1980), we think it specific enough. See generally PHE, Inc. v. Department of Justice, 983 F.2d 248 (D.C. Cir. 1993).
 
 
 26
 One of Landmark's complaints about the Vaughn index is novel--that the index essentially parrots the language of § 6103 innumerable times. So it does. But a Vaughn index is not a work of literature; agencies are not graded on the richness or evocativeness of their vocabularies. The index offers individualized descriptions of the documents themselves and then, typically, asserts the application of § 6103(b)(2)(A) in language that tracks that of the statute itself. It is not the agency's fault that thousands of documents belonged in the same category, thus leading to exhaustive repetition.
 
 
 27
 Finally, Landmark complains about the district court's orders limiting its discovery. Such orders are to be overturned only if they were "clearly unreasonable, arbitrary, or fanciful." Hull v. Eaton Corp., 825 F.2d 448, 452 (D.C. Cir. 1987) (internal quotation marks omitted) (quoting Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 399 (D.C. Cir. 1984)). None of the court's rulings here remotely fits that description.
 
 The judgment of the district court is
 
 28
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Senior Circuit Judge Williams was in regular active service at the time of oral argument.