GARLAND, Circuit Judge,
concurring in the judgment:
Although I join my colleagues in the disposition of this case, I do so based on different reasoning. I do not read FDA v. Brown & Williamson, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), as barring the FDA from regulating “electronic cigarettes” under the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq., because I do not believe the Supreme Court intended its use of the term “tobacco products” to extend to products that do not contain tobacco. The Tobacco Control Act of 2009, Pub.L. No. 111-31, 123 Stat. 1776, however, expressly extends to products that are merely “derived from” tobacco. Accordingly, at least in the absence of a contrary agency interpretation entitled to Chevron deference, I read the Tobacco Control Act as requiring the FDA to regulate products like electronic cigarettes under that Act, rather than under the FDCA.
I
In Brown & Williamson, the Supreme Court held that the FDA lacks authority to regulate “tobacco products” under the drug/device provisions of the FDCA, unless those products are marketed with therapeutic claims. 529 U.S. at 144, 158-59, 120 S.Ct. 1291. On its face, the natural meaning of the term “tobacco product” is a product — like cigarettes or chewing tobacco — that contains tobacco. Although it is true that the liquid nicotine in NJOY’s electronic cigarettes is derived from tobacco, it seems less natural to regard that fact as sufficient to transform NJOY’s plastic cartridges — which contain no tobacco— into a tobacco product. As NJOY acknowledges, its reading leads to the counterintuitive conclusion that a syringe filled with injectable nicotine is a tobacco product as well. Oral Argument Tr. 40-41.
On many, although not all, occasions on which Brown & Williamson used the term “tobacco products,” the Court coupled it with an express reference to tobacco or to products that plainly contain tobacco.[1] At *900 no point did the Court state that the FDA was barred from regulating “nicotine” (or a product containing nicotine but not tobacco) under the FDCA. Thus, the most straightforward reading of the term “tobacco products” is as short-hand for products that contain tobacco. Compare 529 U.S. at 155, 120 S.Ct. 1291 (describing several congressional statutes as “creating a distinct regulatory scheme for cigarettes and smokeless tobacco ”), with id. at 159, 120 S.Ct. 1291 (describing the same statutes as “creating] a distinct regulatory scheme for tobacco products ”) (emphases added).
This reading is consistent with the context in which the Court decided Brown & Williamson. In that case, the Court upheld a challenge to a 1996 FDA rule asserting authority to regulate the sale of cigarettes and smokeless tobacco under the FDCA. 529 U.S. at 126-30, 120 S.Ct. 1291 (citing Regulations Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco to Protect Children and Adolescents, 61 Fed.Reg. 44,396 (Aug. 28, 1996)). Because all of the products at issue in the rule contained tobacco, the Court had no occasion to opine upon the FDA’s authority to regulate a product, like electronic cigarettes, that does not. Indeed, although a product indistinguishable from electronic cigarettes had been introduced some ten years earlier — the “Favor Smokeless Cigarette,” which consisted of a small tube containing an inhalable nicotine solution — there is no indication in Brown & Williamson that the Court had ever heard of it. (The FDA had asserted authority to regulate Favor in 1987, notwithstanding that it was marketed without therapeutic claims. Regulatory Letter from FDA to Advanced Tobacco Prods. Inc. (Feb. 9, 1987) (J.A. 425-26)).
But the most telling indication that the holding of Brown & Williamson does not extend to electronic cigarettes is that the Court’s reasoning does not apply to products that do not contain tobacco. The Supreme Court’s chief rationale for its holding had two premises. First, the Court determined that, “if tobacco products were ‘devices’ under the FDCA, the FDA would be required to remove them from the market.” 529 U.S. at 135, 120 S.Ct. 1291. It reached this conclusion because the FDA may only approve a product for marketing under the FDCA if it is safe and effective for its intended use, and the FDA had “exhaustively documented” that tobacco products are unsafe for any pharmacological use. Id. at 133-35, 120 S.Ct. 1291. Second, the Court found that Congress had “foreclosed the removal of tobacco products from the market” through “tobacco-specific legislation” passed subsequent to the FDCA. Id. at 137, 143, 120 S.Ct. 1291. Thus, the Court concluded: “If they cannot be used safely for any therapeutic purpose, and yet they cannot be banned, they simply do not fit” within the FDCA’s regulatory scheme. Id. at 143, 120 S.Ct. 1291.
Neither premise holds true for pure nicotine or for a tobacco-free product that delivers nicotine. First, unlike products containing tobacco, which the FDA has found to be associated with “cancer, respiratory illnesses, and heart disease,” 529 U.S. at 134-35, 120 S.Ct. 1291, the FDA has not found that nicotine or tobacco-free products that deliver nicotine are inherently unsafe. To the contrary, the FDA has approved several such products marketed with therapeutic claims, determining that they satisfy the FDCA safety requirements that Brown & Williamson determined “tobacco products” could not meet. See FDA Br. 16 (noting that the FDA has *901 approved nicotine gums and transdermal patches). Indeed, the FDA states that “it may well be possible for a manufacturer of ‘electronic cigarettes’ ... to satisfy the FDCA’s safety, effectiveness, and labeling requirements and obtain FDA approval.” Id.
Second, the “tobacco-specific legislation” the Court found dispositive in Brovm & Williamson simply does not address products that deliver nicotine but contain no tobacco. As the Court explained, Congress had “directly addressed the problem of tobacco and health through legislation on six occasions since 1965.” 529 U.S. at 137, 120 S.Ct. 1291.[2] Those statutes impose labeling and advertising requirements that “create a distinct regulatory scheme for cigarettes and smokeless tobacco.” Id. at 155, 120 S.Ct. 1291; see id. at 143-44, 148-49, 120 S.Ct. 1291. Moreover, Congress has declared that “[t]he marketing of tobacco constitutes one of the greatest basic industries of the United States,” id. at 137, 120 S.Ct. 1291 (quoting 7 U.S.C. § 1311(a)), making it “highly unlikely” that the legislature would have subjected the industry to a regulatory regime that could substantially or entirely shut it down, id. at 160, 120 S.Ct. 1291. “[T]he collective premise of these statutes,” the Court said, is “that cigarettes and smokeless tobacco will continue to be sold in the United States.” Id. at 139, 120 S.Ct. 1291.
This “collective premise” does not extend to products, like electronic cigarettes, that contain only nicotine. None of the statutes the Court referenced regulate such products, and the statutory labeling requirements and advertising restrictions the Court cited do not apply to electronic cigarettes. See FDA Br. 10, 13-14. Nor can it be said that FDA regulation of a novel product like electronic cigarettes would threaten the health of the American tobacco industry. As NJOY avers, it “imports one hundred percent of its supply of E-cigarettes from overseas manufacturers, and, upon information and belief, there is no domestic manufacturer of E-cigarettes or their component parts.” NJOY Compl. ¶ 18 (J.A. 40).
Finally, the Brown & Williamson Court also noted that, “[i]n adopting each statute, Congress ... acted against the backdrop of the FDA’s consistent and repeated statements that it lacked authority under the FDCA to regulate tobacco absent claims of therapeutic benefit by the manufacturer.” 529 U.S. at 144, 120 S.Ct. 1291 (emphasis added). “Under these circumstances,” the Court concluded, “it is evident that Congress’ tobacco-specific statutes ... effectively ratified the FDA’s long-held position that it lacks jurisdiction under the FDCA to regulate tobacco products.” Id. (emphasis added). But the backdrop of pre-1996 statements to which the Court referred did not include statements that the FDA lacked authority over a product like nicotine, which is merely derived from tobacco. Rather, as the Court’s citations make clear, the FDA’s statements to Congress referred to its lack of jurisdiction either over “tobacco,” id. at 145, 120 S.Ct. 1291, or over specific products that plainly contain tobacco, like cigarettes, id. at 145-46, 120 S.Ct. 1291. See, e.g., id. at 145, 120 S.Ct. 1291 (citing FDA statement that “[tjobacco marketed for *902 chewing or smoking without accompanying therapeutic claims, does not meet the definitions ... for food, drug, device or cosmetic” in the FDCA). And in fact, as noted above, in 1987 the FDA had asserted authority to regulate a product that is materially indistinguishable from electronic cigarettes — the Favor Smokeless Cigarette — apparently without challenge.
In sum, I see nothing in the words, context, or rationale of Brown & Williamson that supports interpreting that case as barring the FDA from regulating electronic cigarettes under the drug/device provisions of the FDCA. Although I agree with my colleagues that these considerations do not justify reading Brown & Williamson as merely a “carve-out from the FDCA for cigarettes and smokeless tobacco,” Op. at 896, they do justify reading it as a carve-out only for products that contain tobacco. See 529 U.S. at 144, 120 S.Ct. 1291 (holding that Congress intended to “preclude[ ] any role for the FDA” with respect to “tobacco absent claims of therapeutic benefit” (emphasis added)). The Supreme Court had no reason to opine on the status of a product that contains no tobacco, and there is no indication in the opinion that it meant to do so. As my colleagues’ opinion rests on the supposition that it did, I cannot join their rationale.
II
But Brown & Williamson is not the end of the story. In 2009, Congress passed the Tobacco Control Act, which states: “Tobacco products ... shall be regulated by the Secretary under this [Act] and shall not be subject to the provisions of [the drug/device subchapter of the FDCA].” 21 U.S.C. § 387a(a). Moreover, unlike Brown & Williamson, which used the term “tobacco products” without defining it, the Tobacco Control Act includes a definition: “The term ‘tobacco product’ means any product made or derived from tobacco that is intended for human consumption.” 21 U.S.C. § 321(rr)(1) (emphasis added). Because the nicotine in NJOY’s electronic cigarettes is “derived from” natural tobacco, NJOY Compl. ¶ 1, it appears that the FDA may regulate it only pursuant to the provisions of the Tobacco Control Act.
The FDA disagrees with this conclusion, contending that the Tobacco Control Act does not narrow the FDA’s preexisting authority under the FDCA. In support, agency counsel cites another definitional provision of the Tobacco Control Act, which states that “[t]he term ‘tobacco product’ does not mean an article that is a drug ..., a device ..., or a combination product” under the FDCA. 21 U.S.C. § 321(rr)(2). In the FDA’s view, this provision preserves for regulation under the FDCA any product “made or derived from tobacco” that Brown & Williamson did not carve out of the FDCA’s coverage. And because Brown & Williamson’s carve-out did not extend to nicotine-only products, the agency maintains that such products are not necessarily “tobacco products” within the meaning of the Tobacco Control Act.[3]
There is no doubt that § 321(rr)(2) introduces a note of ambiguity into the analysis. But it is a stretch to conclude that, having just used one express statutory subsection to include products “derived from” tobacco within the definition of “tobacco product,” § 321(rr)(l), Congress *903 then immediately employed the next, ambiguous subsection to carve them out again. Rather, it is more likely that § 321(rr)(2) is an expression of Congress’ intent to preserve Brown & Williamson’s holding that even a product made from tobacco — for example, a cigarette — remains a drug, device, or drug/device combination that can be regulated under the FDCA if it is marketed for therapeutic purposes. Hence, the better reading is that § 321(rr)(2) simply makes clear that products made or derived from tobacco that are marketed for therapeutic purposes are not “tobacco products” within the meaning of the Tobacco Control Act, and are therefore subject to regulation under the drug/device provisions of the FDCA.
In the usual circumstance, of course, a judge’s view of the “better” reading of a statute administered by an agency is not necessarily dispositive. “If a statute is ambiguous, and if the implementing agency’s construction is reasonable, Chevron requires a federal court to accept the agency’s construction of the statute, even if the agency’s reading differs from what the court believes is the best statutory interpretation.” Nat’l Cable & Telecomm. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (citing Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 843-44 & n. 11, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). In United States v. Mead Corp., 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), however, the Supreme Court held Chevron deference appropriate only for statutory interpretations with the “force of law,” id. at 229, 121 S.Ct. 2164, and ruled that an agency’s litigation briefs — unlike, for example, its regulations — do not warrant such deference, id. at 238 n. 19, 121 S.Ct. 2164. See also Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212-13, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (declining to accord Chevron deference to “agency litigating positions”); Landmark Legal Found. v. IRS, 267 F.3d 1132, 1135-36 (D.C.Cir.2001) (denying Chevron deference to an interpretation “developed in litigation”).[4]
In this case, there is no agency pronouncement that calls for Chevron deference. Other than its briefs, which do not qualify, the only expression of the FDA’s view regarding electronic cigarettes is the agency’s 2008 detention order barring the importation of NJOY’s products. But that order was issued before Congress passed the Tobacco Control Act in 2009 and hence does not construe it at all. “Chevron being inapplicable here in light of Mead, [the court] must decide for [itself] the best reading” of the Act. Landmark Legal Found., 267 F.3d at 1136. And the best reading is to give full effect to the Tobacco Control Act’s definition of “tobacco product” as “any product made or derived from tobacco,” 21 U.S.C. § 321(rr)(1), as well as to its injunction that “[t]obacco products *904 ... shall be regulated” under that Act and “shall not be subject to the provisions” of the FDCA, 21 U.S.C. § 387a(a).
Ill
In the absence of an authoritative agency interpretation, I conclude that, unless a product derived from tobacco is marketed for therapeutic purposes, the FDA may regulate it only under the provisions of the Tobacco Control Act. Accordingly, because NJOY’s electronic cigarettes are derived from tobacco, I join my colleagues’ disposition. What the result would be were the FDA to offer a contrary statutory interpretation in the form of a regulation, I leave for the day the agency decides to take that step.

. See, e.g., 529 U.S. at 126, 127, 128, 129, 120 S.Ct. 1291 (using the term “tobacco products" in reference to the FDA’s rule concerning the sale of “cigarettes and smokeless tobacco”); id. at 129, 120 S.Ct. 1291 (describing that rule — which was limited to cigarettes and smokeless tobacco — as requiring that a specified statement appear on “all tobacco product packages”); id. at 134, 120 S.Ct. 1291 (noting that the FDA had found “tobacco products” to cause “tobacco-related illnesses, such as cancer, respiratory illnesses, and heart disease”' — illnesses that the FDA associated with tobacco, not nicotine); id. at 142, 120 S.Ct. 1291 (noting that “tobacco products” cannot "be safe within the meaning of the FDCA” because, “[a]s the FDA has documented in great detail, cigarettes and smokeless tobacco are an unsafe means to obtaining any pharmacological effect”); id. at 145, 120 S.Ct. 1291 (describing the FDA’s 1964 testimony that it lacked authority to label cigarette packages as testimony that it lacked jurisdiction to regulate "tobacco products”); id. at 146, 120 S.Ct. 1291 (citing, in support of the proposition that the FDA had never before "asserted authority to regulate tobacco products as customarily marketed,” the fact that the "FDA has repeatedly informed Congress that cigarettes are beyond *900 the scope of the statute absent health claims”).

. The Court listed the following six statutes: "Federal Cigarette Labeling and Advertising Act (FCLAA), Pub.L. 89-92, 79 Stat. 282; Public Health Cigarette Smoking Act of 1969, Pub.L. 91-222, 84 Stat. 87; Alcohol and Drug Abuse Amendments of 1983, Pub.L. 98-24, 97 Stat. 175; Comprehensive Smoking Education Act, Pub.L. 98-474, 98 Stat. 2200; Comprehensive Smokeless Tobacco Health Education Act of 1986, Pub.L. 99-252, 100 Stat. 30; Alcohol, Drug Abuse, and Mental Health Administration Reorganization Act, Pub.L. 102-321, § 202, 106 Stat. 394.” 529 U.S. at 137-38, 120 S.Ct. 1291.

. Like the FDA, NJOY reads § 321(rr)(2) as leaving the boundary between tobacco products and drugs where it was prior to the passage of the Tobacco Control Act. However, because NJOY reads Brown & Williamson as having removed nicotine-only products from the FDCA’s drug/device authority, it concludes that such products are "tobacco products" under the Tobacco Control Act and so may not be regulated under the FDCA.

. As the FDA observes, the Court has accorded deference to briefs in which agencies interpret their own regulations. See Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). The Court, however, distinguishes between agency interpretations of regulations and agency interpretations of statutes. See Coeur Alaska, Inc. v. Southeast Alaska Conservation Council, - U.S. -, 129 S.Ct. 2458, 2473, 174 L.Ed.2d 193 (2009) (finding interpretive memo "not subject to sufficiently formal procedures to merit Chevron deference” under Mead, but still entitled to deference under Auer "because it interprets the agencies’ own regulatory scheme”); see also Mead, 533 U.S. at 246, 121 S.Ct. 2164 (Scalia, J., dissenting) (noting and criticizing the distinction); John F. Manning, Nonlegislative Rules, 72 Geo. Wash. L.Rev. 893, 943-44 (2004) (observing that Mead narrowed the range of agency statutory interpretations that are entitled to Chevron deference, while leaving "intact the related but freestanding principle” of Auer deference).