# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 18, 2014       Decided February 20, 2015

No. 13-5254

PAUL DEPPENBROOK, ON BEHALF OF ALL
RTI BEAVER FALLS EMPLOYEES 9305-04,
APPELLANT

v.

PENSION BENEFIT GUARANTY CORPORATION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00600)

*Paul Deppenbrook*, *pro se*, argued the cause and filed briefs for the appellant.

*Nathaniel Rayle*, Attorney, Pension Benefit Guaranty Corporation, argued the cause for the appellee. *Judith Starr*, General Counsel, *Israel Goldowitz*, Chief Counsel, *Karen L. Morris*, Deputy Chief Counsel and *Kartar Khalsa*, Assistant Chief Counsel were with him on brief.

Before: HENDERSON, GRIFFITH and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Paul Deppenbrook worked for Republic Technologies International, LLC (RTI), a steel company that filed for bankruptcy in 2001. Once bankruptcy proceedings began, the Pension Benefit Guaranty Corporation (PBGC) terminated the pension plans administered by RTI. After many rounds of litigation, the PBGC eventually determined the amounts due former RTI employees under the pension plans and disbursed them. Deppenbrook believes the PBGC miscalculated his benefits. His claim, however, was rejected in his administrative appeal. He then sued the PBGC in district court, raising claims under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq*., and seeking to correct the PBGC's benefit determinations. The district court granted summary judgment to the PBGC. We affirm.[1]

## I.  BACKGROUND

### A.  Statutes

The PBGC is a federal corporation charged with "administer[ing] and enforc[ing] the plan termination insurance provisions" of ERISA. *PBGC v. Fed. Labor Relations Auth.*, 967 F.2d 658, 660 n.1 (D.C. Cir. 1992). It is governed by a board of directors composed of the Secretaries of Labor, Commerce and the Treasury. 29 U.S.C. § 1302(d)(1). One of its goals is "to provide for the timely

---

[1] Although Deppenbrook's notice of appeal indicates that he "and those similarly situated" appeal the district court's judgment, Joint Appendix (JA) 180, Deppenbrook, as a *pro se* party, may represent himself only. *See Georgiades v. Martin-Trigona*, 729 F.2d 831, 834 (D.C. Cir. 1984) (appellee's son, "not a member of the bar of any court," could appear *pro se* but was "not qualified to appear in the District Court or in this court as counsel for others"). We therefore treat Deppenbrook as the sole appellant.

and uninterrupted payment of pension benefits to participants and beneficiaries under plans" covered by ERISA. *Id.* § 1302(a)(2). In order to protect the financial viability of its fund, the PBGC is allowed to terminate a pension plan under certain conditions. *See id.* § 1342(a). As relevant here, the PBGC may terminate a plan when "the possible long-run loss of the [PBGC] with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated." *Id.* § 1342(a)(4). Once the PBGC terminates a pension plan, it "typically becomes trustee of the plan, takes over the assets and liabilities of the plan, and pays benefits to plan participants." *PBGC v. Republic Tech. Int'l, LLC* (*RTI*), 386 F.3d 659, 661 (6th Cir. 2004).

In order to appropriately distribute benefits under a plan, the PBGC and the plan administrator[2] must agree on the date of plan termination. Determining the date can turn contentious. A plan's termination date "is significant" to plan participants "because it marks the date on which [their] benefits . . . cease to accrue." *RTI*, 386 F.3d at 662. It is also important to the PBGC because "the date of termination can significantly affect the extent of PBGC's recovery from the employer," an especially sensitive consideration if "bankrupt corporations with deteriorating financial resources" are involved. *Id*. If these competing interests prevent agreement on a plan termination date, "the termination date of a single-employer plan is . . . the date established by the court." 29 U.S.C. § 1348(a)(4).

---

[2] ERISA defines a plan administrator as "the person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. § 1002(16)(A)(i). If the instrument creating the plan does not specify an administrator, "the plan sponsor" is the administrator. *Id.* § 1002(16)(A)(ii).

The PBGC cannot administer certain types of pension plans. "In enacting ERISA, Congress distinguished between two types of employee retirement benefit plans: 'defined benefit plans' and 'defined contribution plans,' also known as 'individual account plans.' " *Connolly v. PBGC*, 475 U.S. 211, 229 (1986) (O'Connor, J., concurring) (citing 29 U.S.C. §§ 1002(34), (35)) (internal alterations omitted). ERISA's pension insurance program "applies to defined benefit plans but not to defined contribution plans." *Id.* at 229–30 (citing 29 U.S.C. § 1321(b)(1)). The Congress made the distinction because an individual account plan "does not specify benefits to be paid, but instead establishes an individual account for each participant to which employer contributions are made." *Id.* at 230 (citing 29 U.S.C. § 1002(34)); *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (noting there can never be insufficient funds in individual account plan "since each beneficiary is entitled to whatever assets are dedicated to his individual account").

Moreover, not every pension benefit included in a defined benefit plan is insured through ERISA.[3] *See PBGC v. LTV Corp.*, 496 U.S. 633, 637–38 (1990) ("ERISA . . . limits . . . benefits PBGC may guarantee upon plan termination, . . . even if an employee is entitled to greater benefits under the terms of the plan."). The PBGC is obligated to insure only "the payment of all nonforfeitable benefits" a plan participant is due.[4] 29 U.S.C. § 1322(a). The Congress defines "nonforfeitable" to include "a claim obtained by a participant . . . to that part of an immediate or deferred benefit under a

---

[3] A "defined benefit plan" is broadly defined in ERISA as "a pension plan other than an individual account plan." 29 U.S.C. § 1002(35).

[4] The Supreme Court has noted that "nonforfeitable" and "vested" are synonymous in this context. *Nachman Corp. v. PBGC*, 446 U.S. 359, 376–78 (1980).

pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." *Id.* § 1002(19). The PBGC guarantees only those benefits that are nonforfeitable as of the plan termination date. *See LTV Corp.*, 496 U.S. at 637–38 (PBGC insures only "those benefits to which participants have earned entitlement under the plan terms as of the date of termination"); *see also* 29 C.F.R. § 4022.3(a)(1) (PBGC guarantees benefit, subject to minimal exceptions, that "is, *on the termination date*, a nonforfeitable benefit" (emphasis added)); *id.* § 4022.4(a)(3) (same).

## B. Facts

When Deppenbrook's employer filed for bankruptcy, the PBGC stepped in to terminate the employees' pension plan. *RTI*, 386 F.3d at 663–64. The PBGC, however, was concerned about the plan termination date. *Id.* at 664–65. At the heart of the dispute was the availability of "shutdown benefits." *Id.* at 662–63. Shutdown benefits are "enhanced early retirement benefits for certain workers who are affected by a facility shutdown or business cessation." *Id.* Employees who meet "certain age and service requirements" can begin receiving shutdown benefits "after a plant shutdown, rather than having to wait while out of work to reach a specific retirement age." *Id*. at 663. Under the RTI plan, shutdown benefits were triggered by, *inter alia*, a "break in continuous service," which the plan defined as "[t]ermination . . . due to permanent shutdown of a plant, department or subdivision thereof." JA 363. RTI had given notice to its employees in May 2002 that it planned to permanently shut down its plant in Beaver Falls, Pennsylvania, sometime in July or August. Thus, if the plant shutdown happened while the RTI plan was still in effect, the terminated employees would satisfy the plan's "break in continuous service" requirement and would

be eligible to receive shutdown benefits. But if the pension plan terminated before the plant shutdown, the PBGC would not be obligated to guarantee those benefits.

The PBGC selected June 14, 2002, as the plan termination date in order to avoid paying shutdown benefits to former RTI employees. *Id.* at 664–65. The PBGC was concerned because "shutdown benefits [would] potentially increase[] the amount of unfunded liabilities for the plans by almost $96 million." *Id.* at 664. The district court in *RTI*, however, rejected the PBGC's proposed date, concluding that "the plan participants continued to have strong reliance interests in the receipt of shutdown benefits" even after the PBGC notified the participants of their plan's termination. *Id.* at 665. The district court ultimately set the plan termination date as August 17, 2002—one day after RTI sold its assets to another firm—obligating the PBGC to pay shutdown benefits. *Id.*

The Sixth Circuit reversed. It held that "[a]fter the employees received notice that PBGC intended to terminate the pension plans . . ., the participants no longer had a justifiable expectation in the accrual of vested pension rights," including shutdown benefits. *Id.* at 666–67 (internal quotation marks omitted). Moreover, the employees' reliance interest in shutdown benefits was not as "strong" as the district court had concluded because shutdown benefits were "contingent on bankruptcy court approval, and that approval was not given until . . . one month *after* PBGC issued the notices of termination." *Id.* at 667 (emphasis in original). The Sixth Circuit also chastised the district court for not giving "appropriate deference to PBGC's conclusion" and re-set the plan termination date as June 14, 2002.[5] *Id.* at 667–68.

_____

[5] Deppenbrook was also involved in litigation in the Third Circuit. In *Nicol v. USWA*, he and other former RTI employees sued their union—the

The PBGC and RTI entered into a settlement agreement that outlined how the RTI employees' pension-plan accounts were to be administered. While the PBGC administered the defined benefit portion of the plan, the settlement agreement specified that the parties were to hire a third-party accounts administrator to handle the funds in the individual accounts. The agreement provided that the accounts administrator was to terminate the individual accounts and allow employees to receive the funds using one of the options provided under the pension plan. Employees could not, however, decline the distribution. The PBGC also reduced the monthly benefits payable under the defined benefit portion of the plan for employees based on the amounts distributed from the separate individual accounts.

With the settlement agreement in place, the PBGC calculated the monthly benefits owed to each employee. Deppenbrook believed his benefit calculations were in error and sought review by the PBGC Appeals Board. He raised nine claims before the Board but it rejected all of them in a 17-page letter. At the end of its letter, the PBGC Appeals Board informed Deppenbrook of his right to seek further review in federal court.

---

United Steelworkers of America (USWA)—for its conduct during the closing of the plant where they worked. 331 F. App'x 909, 910 (3d Cir. 2009). They alleged that the union was liable for fraud and breach of fiduciary duty. *Id.* The district court granted summary judgment to the USWA on all counts and the Third Circuit affirmed, *id.* at 911, characterizing the employees' claims as claims of "breach of fair representation." *Id.* at 910. This meant that the six-month statute of limitations in 29 U.S.C. § 160(b) applied and that the claims against the USWA came too late. *Id.* at 911. Moreover, irrespective of the time bar, the court concluded that the plaintiffs "utterly failed to raise any material question of fact" and affirmed summary judgment for the union. *Id.*

Deppenbrook sought such review, suing the PBGC in district court here. After discovery was completed, both parties cross-moved for summary judgment. In ruling on the motions, the district court made three central holdings. First, it held that the PBGC properly interpreted ERISA and its own regulations by insuring only benefits that were nonforfeitable on the plan termination date. *See Deppenbrook v. PBGC*, 950 F. Supp. 2d 68, 74–76 (D.D.C. 2013). Consequently, Deppenbrook was not entitled to shutdown benefits because he was not terminated until approximately six weeks after the plan terminated on June 14, 2002. *Id.* at 75–76. Deppenbrook argued that the plan termination date was effectively May 1—rather than June 14—because that was the date on which he received the notice of plant closure pursuant to the Worker Adjustment and Retraining Act (WARN Act), 29 U.S.C. §§ 2101–2109.[6] The district court rejected the argument because the WARN Act notice spoke of plant closure as a likelihood, not a certainty. *Deppenbrook*, 950 F. Supp. 2d at 76–77. Second, the court held that the WARN Act's 60-day notice requirement, 29 U.S.C. § 2102(a), was not a "required waiting period" under ERISA, *id.* § 1301(a)(8), and therefore did not cause shutdown benefits to vest on May 1. *Deppenbrook*, 950 F. Supp. 2d at 77–78. And third, the district court held that the PBGC properly declined to administer the individual account portions of the pension plan. *Id.* at 78. Although Deppenbrook's defined benefit and individual account plans merged into one plan after a corporate reorganization in 1998, the merger did not "create[]

---

[6] The WARN Act "provides protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs." 20 C.F.R. § 639.1(a). The advance notice allows "workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." *Id.*

an obligation" in the PBGC to "insure the entirety of the combined plan." *Id.* Accordingly, the district court granted summary judgment to the PBGC. *Id.* at 80. Deppenbrook timely appealed.

## II. ANALYSIS

We review a district court's grant of summary judgment *de novo*. *Forsyth Mem'l Hosp., Inc. v. Sebelius*, 639 F.3d 534, 537 (D.C. Cir. 2011). Summary judgment is granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Our inquiry is more nuanced, however, if the dispute involves the review of agency action. "When the judgment of the district court is on review of an administrative decision, . . . we review the administrative record to determine whether the agency's decision was arbitrary and capricious, and whether its findings were based on substantial evidence." *Forsyth*, 639 F.3d at 537. We therefore accord "no particular deference to the judgment of the District Court." *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002). We uphold summary judgment for the agency unless it "violated the Administrative Procedure Act by taking action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or is 'unsupported by substantial evidence.' " *Forsyth*, 639 F.3d at 537 (quoting 5 U.S.C. § 706(2)).

We consider one matter before addressing Deppenbrook's arguments. When we are called to interpret a statute that the agency under review is charged with administering, we typically apply *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). Under that framework:

> We first ask whether Congress has directly spoken to the precise question at issue, in

>which case we must give effect to the unambiguously expressed intent of Congress. If the statute is silent or ambiguous with respect to the specific issue, however, we move to the second step and defer to the agency's interpretation as long as it is based on a permissible construction of the statute.

*NRDC v. EPA*, 706 F.3d 428, 431 (D.C. Cir. 2013) (internal quotation marks omitted). Here, however, our inquiry is somewhat muddied. During oral argument, we noted that the PBGC had not offered an authoritative interpretation of the provisions at issue. Oral Arg. Recording at 18:10–19:10. In other words, we do not have the PBGC's pre-litigation interpretation to which we can defer. *See Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1136 (D.C. Cir. 2001) (declining to apply *Chevron* deference to statutory interpretation agency "developed in litigation"). Had the PBGC Appeals Board offered its statutory interpretation in its decision-letter to Deppenbrook, that interpretation would likely be subject to the two-step *Chevron* framework. *See Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1279–80 (D.C. Cir. 2004) (applying *Chevron* deference to FDA letter decision in informal adjudication). But the PBGC had no reason to offer an interpretation because Deppenbrook did not raise in his administrative appeal the statutory arguments he now raises. This failure ordinarily results in forfeiture. *See Malladi Drugs & Pharms., Ltd. v. Tandy*, 552 F.3d 885, 891 (D.C. Cir. 2009) ("We consistently refuse to consider arguments litigants raise for the first time in court rather than before the agency . . . ."); *Military Toxics Project v. EPA*, 146 F.3d 948, 956–57 (D.C. Cir. 1998) (argument not raised before agency is forfeited because parties "may not raise [an argument] for the first time upon appeal"). Any forfeiture by Deppenbrook, however, has itself been forfeited

as the PBGC has not raised it.  *See BNSF Ry. Co. v. Surface Transp. Bd.*, 604 F.3d 602, 611 (D.C. Cir. 2010) ("a forfeiture can be forfeited by failing on appeal to argue an argument was forfeited").  Nevertheless, whether we apply *Chevron* deference or simply rely on the PBGC's "power to persuade," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), our conclusion is the same: the PBGC properly applied ERISA. *See Springfield, Inc. v. Buckles*, 292 F.3d 813, 817–18 (D.C. Cir. 2002) (avoiding in-depth analysis regarding level of deference because agency decision affirmable "under either line of authority").

On appeal, Deppenbrook makes three arguments.  First, he argues that he was entitled to shutdown benefits because he was constructively terminated before June 14, 2002, the date of the plan termination.  Second, he contends that ERISA required the PBGC to insure and administer the funds in his individual account.  And third, he claims that the PBGC unlawfully amended the provisions of his pension plan.

## A.  Shutdown Benefits

As already noted, shutdown benefits "are enhanced early retirement benefits for certain workers who are affected by a facility shutdown or business cessation."  *RTI*, 386 F.3d at 662–63.  The point at which shutdown benefits vest under Deppenbrook's pension plan turns on, *inter alia*, the date on which the employee experienced a break in continuous service.  His pension plan defines "break in continuous service," as relevant here, to include "[t]ermination . . . due to permanent shutdown of a plant, department or subdivision thereof."  JA 363.  Based on the plan termination date of June 14, 2002, set by the Sixth Circuit in *RTI*, shutdown benefits were purportedly off the table.  RTI and the USWA decided that the nominal shutdown date for Deppenbrook's plant was

July 11, 2002, the date that the bankruptcy court approved RTI's asset sale. And it is undisputed that Deppenbrook was not, in fact, terminated until August 16, 2002. Because he did not experience a "break in continuous service" until well after the plan termination date, shutdown benefits did not vest in time to become nonforfeitable and covered by ERISA. *See* 29 U.S.C. § 1322(a); *see also* 29 C.F.R. §§ 4022.3(a)(1), 4022.4(a)(3).

Deppenbrook attempts to circumvent this result by arguing that he was effectively terminated on May 1, 2002, the date he received the WARN Act notice.[7] The notice, however, cannot bear this weight. First, the WARN Act notice spoke of shutdown as a likelihood, not a certainty. The notice stated that the company "*plans* to permanently" close the plant where Deppenbrook worked. JA 275 (emphasis added). It also cautioned that permanent closure was "subject to the approval of the Bankruptcy Court," meaning the plant remained open indefinitely until the bankruptcy court acted. *Id.* The notice closed by reserving the employer's rights under the WARN Act "should circumstances change." *Id.* And above all, it is undisputed that Deppenbrook remained employed until August 2002, long after he received the WARN Act notice.

Deppenbrook further posits that, under ERISA, the WARN Act notice period is a "required waiting period."

---

[7] Deppenbrook also appears to argue that he was effectively terminated when he received a 90-day advance notice of plant closure pursuant to a provision in the master collective bargaining agreement. This argument fails because, like the WARN Act notice, the 90-day advance notice period is not a "required waiting period" under ERISA. *See infra* pp. 13–14. In any event, even if the 90-day advance notice period were such a waiting period, Deppenbrook had no break in continuous service before the plan termination date.

ERISA defines a nonforfeitable benefit as a benefit for which the plan participant has "satisfied the conditions for entitlement . . . other than . . . completion of *a required waiting period*." 29 U.S.C. § 1301(a)(8) (emphasis added). Deppenbrook contends that he satisfied the conditions for shutdown benefits on May 1, the day he received the WARN Act notice. The period of time after he received the notice was simply a "required waiting period" that did not affect the vesting of his shutdown benefits on May 1. We disagree.

The WARN Act 60-day period is explicitly described by statute as a "notice" period, not a "required waiting period." *See* 29 U.S.C. § 2102(a). Additionally, the text of ERISA forestalls Deppenbrook's argument. The relevant provision reads:

> "[N]onforfeitable benefit" means, with respect to a plan, a benefit for which a participant has satisfied the conditions for entitlement *under the plan or the requirements of this chapter* (other than submission of a formal application, retirement, completion of a *required waiting period*, or death in the case of a benefit which returns all or a portion of a participant's accumulated mandatory employee contributions upon the participant's death) . . . .

*Id.* § 1301(a)(8) (emphasis added). The phrase "under the plan or the requirements of this chapter" modifies the circumstances in the parenthetical that follows. In other words, the "required waiting period" must be part of the pension plan or appear in chapter 18 of title 29. The WARN Act notice period, however, is not a part of Deppenbrook's pension plan and is located in a different chapter. *Compare id.* § 1301 (located in chapter 18 of title 29) *with id.* § 2102

(located in chapter 23 of title 29). Consequently, the WARN Act notice period is not a mere waiting period within the meaning of ERISA's definition of a nonforfeitable benefit. Even if it were, that would not advance Deppenbrook's cause. That is, even if ERISA did not require Deppenbrook to wait out the WARN Act period, he nonetheless had to meet the plan's other "conditions for entitlement" before the plan termination date—namely, the requirement that he incur a break in continuous service. As discussed earlier, he was not terminated as of the date of the WARN Act notice because he remained employed until mid-August. The PBGC therefore properly interpreted the provisions of ERISA and did not act arbitrarily or capriciously in declining to provide shutdown benefits to Deppenbrook.

## B. Individual Accounts

Deppenbrook next contends that the PBGC misinterpreted 29 U.S.C. § 1321 in failing to insure his individual account, instead forcing Deppenbrook to receive a lump sum distribution of his individual account balance and then offsetting his monthly pension payable under the PBGC-administered defined benefit portion of his plan by an equal amount. But he acknowledges, as he must, that ERISA's coverage does not extend to an "individual account plan," 29 U.S.C. § 1321(b)(1), or to a "defined benefit plan, to the extent that it is treated as an individual account plan," *id.* § 1321(b)(12). The PBGC points to these provisions as support for its decision not to administer Deppenbrook's individual account plan. Deppenbrook responds that the governing provision is 29 U.S.C. § 1321(c)(1), which states that "the term 'individual account plan' does not include a plan under which a fixed benefit is promised if the employer or his representative participated in the determination of that benefit." According to Deppenbrook, then, the PBGC had to

insure his individual account because section 1321(c)(1) provides that it was *not* an individual account under ERISA. We are unpersuaded.

An individual account plan is defined as "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses" attributed to the account. *Id.* § 1002(34). Deppenbrook's pension-plan benefit included "a defined benefit pension determined in accordance with Article 5" of the pension plan, as well as an "Individual Account Benefit based on the balance of the Individual Account of the Participant." JA 410. Each individual account was simply "an account maintained on behalf of a" plan participant. *Id.* at 411. As explained earlier, *supra* page 4, the PBGC is statutorily prohibited from insuring this account.

Section 1321(c)(1) does not help Deppenbrook. That section provides that an individual account plan "does not include a plan under which a fixed benefit is promised if the employer or his representative participated in the determination of that benefit." Deppenbrook's individual account was *not* comprised of a fixed benefit determined by his employer. Instead, each individual account operated as a collection of funds that were invested but with no guarantee that a specified amount would be owed each employee once he retired. *See* JA 414 ("Upon any retirement or other termination of employment under Article 4 of the [pension] Plan, a Participant shall be eligible for a monthly pension benefit equal to that which can be provided *by the vested value of his Individual Account*." (emphasis added)).

Deppenbrook notes that, as a result of an earlier corporate merger, he had one pension plan—a defined benefit plan—

with an individual account component. He believes that the individual account was part of the overall defined benefit plan and that the PBGC was thus obligated to insure the entirety of the plan. The individual account, however, is explained in a separate appendix to the defined benefit plan. Deppenbrook does not point to any evidence that his individual account ever merged with his defined benefit account. Instead, it retained the essential features of an individual account throughout the course of his employment at RTI. Because the Congress wanted the PBGC to insure only those portions of a plan that promise a guaranteed benefit, both the text and purpose of ERISA make clear that the PBGC could not insure Deppenbrook's individual account. The PBGC therefore properly interpreted ERISA and did not act arbitrarily or capriciously in failing to insure Deppenbrook's individual account.

## C.  Unlawful Amendment

Deppenbrook's final argument is that the PBGC unlawfully amended his pension plan by requiring him to accept a distribution of his individual account (triggering an offsetting reduction in the payments to him under the defined benefit portion of the plan). Assuming *arguendo* that the PBGC in fact amended the plan, Deppenbrook cannot identify a statutory provision that bars the PBGC from doing so. He points to 29 U.S.C. § 1054(g), which says that a plan participant's accrued benefit generally "may not be decreased by an amendment of the plan." *But see Hughes*, 525 U.S. at 442 ("ERISA provides an employer with broad authority to amend a plan . . . ."). Yet the PBGC and the plan termination insurance program are addressed in an entirely different subchapter of ERISA. *Compare* 29 U.S.C. § 1054 (appearing in subchapter I of chapter 18), *with id.* § 1302 (appearing in subchapter III of chapter 18). ERISA makes clear that section

1054 applies if an employer—not the PBGC—retains control over a pension plan. *See id.* § 1003(a)(1) ("this subchapter," *i.e.* § 1054 subchapter, applies to pension plans maintained by, *inter alia*, "any *employer* engaged in commerce or in any industry or activity affecting commerce" (emphasis added)).

For the foregoing reasons, the district court's judgment is affirmed.

*So ordered.*