# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 12, 2015        Decided May 19, 2015

No. 14-5061

DISTRICT HOSPITAL PARTNERS, L.P., DOING BUSINESS AS
GEORGE WASHINGTON UNIVERSITY HOSPITAL, ET AL.,
APPELLANTS

v.

SYLVIA MATHEWS BURWELL, SECRETARY OF THE UNITED
STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00116)

———

*Robert L. Roth* argued the cause for the appellants. *James F. Segroves* and *John R. Hellow* were with him on brief.

*John L. Oberdorfer*, *Pierre H. Bergeron*, *Stephen P. Nash* and *Sven C. Collins* were on brief for the *amici curiae* Non-Profit Hospitals in support of the appellants.

*James C. Luh*, Trial Attorney, United States Department of Justice, argued the cause for the appellee. *Stuart F. Delery*, Assistant Attorney General, *Ronald C. Machen*, *Jr.*, U.S. Attorney, and *H. Thomas Byron III*, Attorney, were with him on brief.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: This case requires us to slough through the "labyrinthine world" of Medicare reimbursements. *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 694 (D.C. Cir. 2014). Under the current system, hospitals are reimbursed for treating a Medicare patient based on the average treatment cost for that patient's ailment/condition. Some patients, however, require protracted care that far outpaces an illness's average cost of treatment. To account for this, hospitals can request "additional payments," known as outlier payments, if the cost of treating a particular patient is sufficiently high. 42 U.S.C. § 1395ww(d)(5)(A). Every year, the Secretary of Health and Human Services (HHS) sets a monetary threshold above which outlier payments may be recovered.

A group of 186 hospitals that participates in Medicare believes that the HHS Secretary set the monetary threshold for outlier payments too high in 2004, 2005 and 2006. Led by District Hospital Partners (DHP), the hospitals sued the Secretary in federal district court, claiming that she violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, by engaging in arbitrary and capricious decision-making. They also moved to supplement the administrative record. The district court denied the motion to supplement in part and rejected DHP's APA challenges to each outlier threshold. We affirm the district court's partial denial of the motion to supplement and its rejection of the APA challenges to the 2005 and 2006 outlier thresholds. Its conclusion that the 2004 threshold is adequately explained, however, is erroneous and

we therefore reverse its summary judgment grant to the Secretary on this claim and remand to the district court with instructions to remand to the Secretary for further proceedings. *See Miller v. Dep't of Navy*, 476 F.3d 936, 939–40 (D.C. Cir. 2007).

## I.  BACKGROUND

### A.  THE OUTLIER PAYMENT SYSTEM

Medicare was "[e]stablished in 1965 as part of the Social Security Act." *Fischer v. United States*, 529 U.S. 667, 671 (2000).  It operates as a "federally funded medical insurance program for the elderly and disabled," *id.*, and is managed by the HHS Secretary, 42 U.S.C. § 1395kk(a).  The program originally reimbursed hospitals for the "reasonable costs" of services provided to Medicare patients.  *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999).  That system deteriorated over time, however, because it provided "little incentive for hospitals to keep costs down," as "[t]he more they spent, the more they were reimbursed."  *Id.*  In 1983, the Congress became particularly concerned "that hospitals reimbursed on a reasonable cost basis lacked incentives to operate efficiently."  *Transitional Hosps. Corp. of La., Inc. v. Shalala*, 222 F.3d 1019, 1021 (D.C. Cir. 2000).

To rectify the problem, the Congress shifted to a prospective payment system that reimburses hospitals based on the average rate of "operating costs [for] inpatient hospital services."  *Cnty. of L.A.*, 192 F.3d at 1008.  Because different illnesses entail varying costs of treatment, the Secretary uses diagnosis-related groups (DRGs) to "modif[y]" the average rate.  *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011).  A DRG is a group of related illnesses to which the Secretary assigns a weight representing "the relationship between the cost of treating patients within that group and the

average cost of treating all Medicare patients." *Id*. at 205–06. To calculate a specific reimbursement, the Secretary "takes the [average] rate, adjusts it [to account for regional labor costs], and then multiplies it by the weight assigned to the patient's DRG." *Cnty. of L.A.*, 192 F.3d at 1009.

The major innovation of the prospective payment system is that hospitals are "reimbursed at a *fixed* amount per patient, regardless of the actual operating costs they incur in rendering [those] services." *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 822 (2013) (emphasis added). The new system incentivizes hospitals to keep costs as low as possible. But the "Congress recognized that health-care providers would inevitably care for some patients whose hospitalization would be extraordinarily costly or lengthy." *Cnty. of L.A.*, 192 F.3d at 1009. To account for costly patients, the Congress allows hospitals to request outlier payments. *See* 42 U.S.C. § 1395ww(d)(5)(A)(ii). A hospital is eligible for an outlier payment "in any case where charges, adjusted to cost, exceed . . . the sum of the applicable DRG prospective payment rate . . . plus a fixed dollar amount determined by the Secretary." *Id*.

Although calculating outlier payments is an elaborate process, three particular numbers are important: (1) the cost-to-charge ratio, (2) the fixed loss threshold, and (3) the outlier threshold. A hospital's cost-to-charge ratio is calculated from data in its most recent cost report. *See* 42 C.F.R. § 412.84(i)(2). The ratio represents a hospital's "average markup." *Appalachian Reg'l Healthcare, Inc. v. Shalala*, 131 F.3d 1050, 1052 (D.C. Cir. 1997). Markup is key because outlier payments are available only "where charges, *adjusted to cost*, exceed" the applicable DRG rate by a fixed amount. 42 U.S.C. § 1395ww(d)(5)(A)(ii) (emphasis added). The ratio ensures that the Secretary does not simply reimburse a hospital for the charges reflected on a patient's

invoice but instead only for charges that are "adjusted to cost." *Id*. Applying the cost-to-charge ratio in practice is straightforward. For example, if a hospital's cost-to-charge ratio is 75% (total costs are approximately 75% of total charges), the Secretary multiplies the hospital's charges by 75% to calculate the hospital's cost. *See Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1229 n.3 (11th Cir. 2009).

The second important number is the fixed loss threshold. A hospital can request an outlier payment if its charges exceed the "DRG prospective payment rate . . . plus *a fixed dollar amount* determined by the Secretary." 42 U.S.C. § 1395ww(d)(5)(A)(ii) (emphasis added). The italicized portion—"a fixed dollar amount"—is known as the fixed loss threshold. In effect, this threshold "acts like an insurance deductible because the hospital is responsible for that portion of the treatment's excessive cost" above the applicable DRG rate. *Boca Raton Cmty. Hosp.*, 582 F.3d at 1229. The Secretary calculates a new fixed loss threshold for each fiscal year. *See* 42 U.S.C. § 1395ww(d)(6).

The third number is the outlier threshold. The Secretary calculates it by adding the DRG rate for a certain illness or condition to the fixed loss threshold.[1] *See Cnty. of L.A.*, 192

---

[1] We have simplified the calculation. Although the outlier threshold is calculated by adding the applicable DRG rate to the fixed loss threshold, there are other variables that must be added to that amount as well. These include "any IME and DSH payments, and any add-on payments for new technology." 68 Fed. Reg. 45,346, 45,477 (Aug. 1, 2003). IME is an acronym for indirect costs of medical education, which the Secretary must consider in disbursing outlier payments. *See* 42 U.S.C. § 1395ww(d)(5)(B). DSH is an acronym for a disproportionate share hospital, which considers whether a hospital serves a disproportionate share of

F.3d at 1009. Any cost-adjusted charges imposed above the outlier threshold are eligible for reimbursement under the outlier payment provision. *See* 42 U.S.C. § 1395ww(d)(5)(A)(ii). Since 2003, outlier payments have been 80% of the difference between a hospital's adjusted charges and the outlier threshold. *See* 68 Fed. Reg. at 45,476; 42 C.F.R. § 412.84(k).

We can tie this all together with an example. Assume that the Secretary sets the fixed loss threshold at $10,000. Assume also that a hospital treats a Medicare patient for a broken bone and that the DRG rate for the treatment is $3,000. The Medicare patient required unusually extensive treatment which caused the hospital to impose $23,000 in cost-adjusted charges. If no other statutory factor is triggered, *see supra* n.1, the hospital is eligible for an outlier payment of $8,000, which is 80% of the difference between its cost-adjusted charges ($23,000) and the outlier threshold ($13,000). *See generally* 62 Fed. Reg. 45,966, 45,997 (Aug. 29, 1997) (explaining similar example).

Apart from calculating individual reimbursements, the Secretary must also ensure that total outlier payments are neither "less than 5 percent nor more than 6 percent" of the total DRG-related payments in a given year. 42 U.S.C.

---

low-income patients. *See id*. § 1395ww(d)(5)(F). And technological add-on payments refer to the Secretary's obligation to consider whether the applicable DRG rate takes into account the expenses of "a new medical service or technology." *Id*. § 1395ww(d)(5)(K)(ii)(I). None of these additional variables—IME, DSH and technology add-on payments—is relevant here. For convenience, then, we refer to the outlier threshold as the sum of the applicable DRG rate and the fixed loss threshold.

§ 1395ww(d)(5)(A)(iv). The Secretary complies with this provision by selecting outlier thresholds that, "when tested against historical data, will likely produce aggregate outlier payments totaling between five and six percent of projected . . . DRG-related payments." *Cnty. of L.A.*, 192 F.3d at 1013. Nevertheless, testing against historical data is only a predictive exercise. *Id*. at 1009. Accordingly, the Secretary does not take corrective action once the fiscal year ends even if outlier payments fall outside the five-to-six per cent range. *Id.* We have upheld this practice. *Id*. at 1020.

## B. THE OUTLIER CORRECTION RULE

The outlier payment system began to break down in the late 1990s. Outlier payments were supposed to be made "only in situations where the cost of care is extraordinarily high in relation to the average cost of treating comparable conditions or illnesses." 68 Fed. Reg. 10,420, 10,423 (Mar. 5, 2003). But hospitals could manipulate the outlier regulations if their charges were "not sufficiently comparable in magnitude to their costs." *Id.* The Secretary issued a notice of proposed rulemaking (NPRM) to address these concerns. *Id.* at 10,420.

In the NPRM, the Secretary described how a hospital could use "the time lag between the current charges on a submitted bill and the cost-to-charge ratio taken from the most recent settled cost report." *Id.* at 10,423. A hospital knows that its cost-to-charge ratio is based on data submitted in past cost reports. *Id.* If it dramatically increased charges between past cost reports and the patient costs for which reimbursement is sought, its cost-to-charge ratio would "be too high" and would "overestimate the hospital's costs." *Id.* Some hospitals took advantage of this weakness in the system. The Secretary identified "123 hospitals whose percentage of outlier payments relative to total DRG payments increased by at least

5 percentage points" between fiscal years 1999 and 2001. *Id.* The adjusted charges at those 123 hospitals "increased at a rate at or above the 95th percentile rate of charge increase for all hospitals . . . over the same period." *Id.* And during that time, the 123 hospitals had a "mean rate of increase in charges [of] 70 percent" alongside a decrease of "only 2 percent" in their cost-to-charge ratios. *Id.* at 10,424. The 123 hospitals are referred to as turbo-chargers.

The Secretary published the final rule three months after the NPRM. *See* 68 Fed. Reg. 34,494 (June 9, 2003) (outlier correction rule). As relevant here, the Secretary adopted two new provisions to close the gaps in the outlier payment system. First, a hospital's cost-to-charge ratio was to be calculated using more recent cost reports. *Id.* at 34,497–99 (codified at 42 C.F.R. § 412.84(i)(1)–(2)). This change reduced "the time lag for updating cost-to-charge ratios by a year or more" and ensured that those ratios accurately reflected a hospital's costs. *Id.* at 34,497. Second, a hospital's outlier payments were to be subject to reconciliation when its "cost report[] coinciding with the discharge is settled." *Id.* at 34,504 (codified at 42 C.F.R. § 412.84(i)(4)). Outlier payments were still disbursed based on the "best information available at that time." *Id*. at 34,501. They were adjusted after the fact, however, if the "actual cost-to-charge ratios [were] found to be plus or minus 10 percentage points from the cost-to-charge ratio" used to calculate the outlier payments. *Id.* at 34,503.

## C. THE CHALLENGED RULES

Once the Secretary promulgated the outlier correction rule, she initiated rulemakings to set the outlier thresholds for 2004, 2005 and 2006, respectively. *See* 68 Fed. Reg. 45,346; 69 Fed. Reg. 48,916 (Aug. 11, 2004); 70 Fed. Reg. 47,278 (Aug. 12, 2005). DHP challenges all three rules. Each one is

quite long and has its own context. We therefore summarize them individually.

In the 2004 rule, the Secretary established the outlier threshold at "the prospective payment rate for the DRG . . . plus $31,000." 68 Fed. Reg. at 45,477. To arrive at the $31,000 threshold, the Secretary had to "simulate[] payments" for 2004. *Id.* at 45,476. In order to simulate 2004 payments, the Secretary used cost and charge data from 2002 and "inflate[d]" it by two years to predict charges for 2004. *Id.* The Secretary inflated the 2002 data using the "2-year average annual rate of change in charges per case" between 2000 and 2002. *Id.* The average annual rate of change is sometimes referred to as the "charge inflation factor." *Id.* at 45,477. The charge data used to calculate the charge inflation factor came from all hospitals' "cost-to-charge ratios." *Id.* at 45,476.

The Secretary also made adjustments in the 2004 rulemaking to account for the outlier correction rule. One change was to use "more recent cost-to-charge ratios" in order to best "approximate" the "latest tentative settled cost reports." *Id.* Another change took account of the possibility that hospitals' outlier payments were subject to the reconciliation process set forth in the outlier correction rule. [2] *Id.*

---

[2] As discussed, *supra* p. 8, the reconciliation process corrects for hospitals that take advantage of the time lag in updating cost-to-charge ratios. *See* 68 Fed. Reg. at 34,500–01. The outlier correction rule reduced "the opportunity for hospitals to manipulate the system to maximize outlier payments." *Id*. at 34,501. But the Secretary recognized that the outlier correction rule did not eliminate "all such opportunity." *Id*. A hospital could still skew the system by increasing charges for current invoices because the Secretary used past cost-to-charge ratios that did not capture the most recent charge increases. *See id*. To account for this asymmetry, the

Specifically, the Secretary made preliminary calculations and found "approximately 50 hospitals [she] believe[d] will be reconciled." *Id.* To avoid understating the rate of charge inflation for these hospitals, the Secretary "attempted to project each hospital's cost-to-charge ratio" using "its rate of increase in charges per case based on [fiscal year] 2002 charges, compared to costs." *Id.* at 45,477.

One commenter asked the Secretary to "factor in the calculation of the [outlier] threshold the fact that certain hospitals have distorted their charges significantly." *Id*. at 45,477. In other words, the commenter wanted the 2004 outlier threshold to account for the turbo-chargers. The Secretary answered this concern by noting that the 2004 threshold "reflect[s] the changes made to outliers from the [outlier correction] rule." *Id*. Had the Secretary not accounted for the changes, the 2004 fixed loss threshold would have been "approximately $50,200." *Id*. The difference between this amount and the one selected—$31,000—allowed hospitals "to qualify for higher outlier payments due to the lower threshold." *Id.* The Secretary therefore saw no harm to hospitals because "the [2004] threshold ha[d] fallen significantly from the proposed threshold." *Id.*

---

Secretary created the reconciliation process. Outlier payments are still disbursed based on the most recently available "cost-to-charge ratios." *Id*. at 34,504. But once the cost report "coinciding with the discharge is settled"—which occurs *after* the outlier payment for that discharge is disbursed—the Secretary will reconcile (*i.e.*, adjust) outlier payments after the fact. *Id.* at 34,504. Reconciliation occurs if the hospital's actual cost-to-charge ratio is "plus or minus 10 percentage points from the cost-to-charge ratio used during that time period to make outlier payments." *Id*. at 34,503. Consequently, any interim gains from turbo-charging are erased through post-disbursement reconciliation.

In the 2005 rule, the Secretary established that the outlier threshold was to be "equal to the prospective payment rate for the DRG . . . plus $25,800." 69 Fed. Reg. at 49,278. But she arrived at that threshold only after a number of commenters urged her to adopt a methodology different from the one set forth in the proposed rule. The proposed rule provided that the 2005 outlier threshold was to be the applicable DRG rate "plus $35,085." *Id.* at 49,276. Some commenters worried that raising the fixed loss threshold from $31,000 to $35,085 "would make it more difficult for hospitals to qualify for outlier payments and put them at greater risk when treating high cost cases." *Id.* The Secretary considered these concerns and revised the methodology "in order to calculate the [fiscal year] 2005 outlier thresholds." *Id.* at 49,277. Her revision accounted for the changes in the outlier correction rule and the "exceptionally high rate of hospital charge inflation [*i.e.*, turbo-charging] that is reflected in the data" for 2001, 2002 and 2003. *Id.* The Secretary was unable to anticipate these changes in 2004 because she had "insufficient data" due to the "limited time from the publication of [the outlier correction rule] to the publication" of the 2004 outlier threshold. *Id.*

As she did one year earlier, the Secretary had to "simulate[] payments" for 2005 using past data based on "hospital cost-to-charge ratios." *Id.* But "[i]nstead of using the 2-year average annual rate of change in charges per case" between 2001 and 2003, the Secretary took the "unprecedented step" of using data from the most recent fiscal year. *Id.* This innovation required her to calculate "the 1-year average annual rate of change in charges per case from the first half of [fiscal year] 2003 to the first half of [fiscal year] 2004." *Id.* She believed that these changes would lead to a "more accurate determination of the rate of change in charges per case" between 2003 and 2005. *Id.* The Secretary also decided

there was no need to account for the effect of reconciliation; given the outlier correction rule, she declared, "the majority of hospitals' cost-to-charge ratios will not fluctuate significantly enough . . . to meet the criteria to trigger reconciliation of their outlier payments." *Id.* at 49,278.

For 2006, the Secretary established that the outlier threshold was to be "equal to the prospective payment rate for the DRG . . . plus $23,600." 70 Fed. Reg. at 47,494. As with the earlier rules, the Secretary had to "simulate payments" for 2006 using past data. *Id.* But she worried that data from 2002 and 2003 was skewed by "the atypically high rate of hospital charge inflation" during that time. *Id.* To ensure the data was not tainted by charge inflation, she opted to calculate the "charge inflation factor based on the first six months of [fiscal year] 2005 relative to [the] same period for [fiscal year] 2004." *Id.* The data for 2004 and 2005 was "taken from the most recent tentatively settled cost reports of hospitals." *Id*. Her choice was significant because the outlier correction rule was in effect for the entire period, meaning that the past data "fully incorporate[d] implementation of the new outlier policy." *Id*.

## D.  PROCEDURAL HISTORY

DHP asserts that, had the Secretary "established more accurate outlier thresholds for federal fiscal years 2004, 2005 and 2006, [it] would have received substantially more in outlier payments." Compl. ¶ 20. After pursuing administrative remedies for some claims, *see* 42 U.S.C. § 1395*oo*(a), it filed suit in federal district court. The Secretary moved to dismiss the complaint on the grounds of failure to exhaust administrative remedies and failure to state a claim for relief. *See Dist. Hosp. Partners, LP v. Sebelius*, 794 F. Supp. 2d 162, 164 (D.D.C. 2011). The district court dismissed the

unexhausted claims but concluded that the APA challenges to the outlier thresholds should be resolved on summary judgment.  *Id.* at 173.

The parties subsequently proceeded to discovery but could not agree on the contents of the administrative record.  DHP eventually filed a motion to compel the Secretary to supplement the record.  *See Dist. Hosp. Partners, LP v. Sebelius*, 971 F. Supp. 2d 15, 18–19 (D.D.C. 2013).  The district court supplemented the 2004 rulemaking record with two documents: (1) a public comment on the 2004 outlier threshold; and (2) a version of the outlier correction rule the Secretary had sent to the Office of Management and Budget (OMB) for review but eventually abandoned.  *Id.* at 28, 31.  *See generally* Exec. Order No. 12,866 § 6(a)(3)(B)(i), 58 Fed. Reg. 51,735 (Sept. 30, 1993) (requiring agencies taking "significant regulatory action" to send OMB "[t]he text of the draft regulatory action" before publication in the Federal Register).  After discovery concluded, the parties cross-moved for summary judgment.  *See Dist. Hosp. Partners, LP v. Sebelius*, 973 F. Supp. 2d 1, 5 (D.D.C. 2014).  The district court granted summary judgment to the Secretary because she "made reasonable methodological choices in determining the fixed loss thresholds" for 2004, 2005 and 2006.  *Id.*  DHP timely appealed.

## II.  ANALYSIS

We review a grant of summary judgment *de novo*. *Deppenbrook v. PBGC*, 778 F.3d 166, 171 (D.C. Cir. 2015). Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "Our inquiry is more nuanced, however, if the dispute involves the review of agency action."  *Deppenbrook*,

778 F.3d at 171. If so, "we review the administrative record" directly and "accord no particular deference to the judgment of the District Court." *Id.* (quotation mark omitted). We will affirm summary judgment for the agency unless it "violated the Administrative Procedure Act by taking action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Id.* (quoting 5 U.S.C. § 706(2)). We review the district court's "refusal to supplement the administrative record for abuse of discretion." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

DHP makes three arguments on appeal. First, it claims that the district court should have ordered the Secretary to supplement the administrative record with additional documents. Second, it contends that the Secretary violated the APA by failing to use the best available data. And third, it argues that the outlier thresholds for 2004, 2005 and 2006 were set too high and are therefore arbitrary and capricious. We address each argument in turn.

## A. SUPPLEMENTING THE ADMINISTRATIVE RECORD

DHP claims that the district court abused its discretion by not including additional materials in all three rulemaking records. We disagree.[3]

In evaluating agency action under the APA, our review must "be based on the full administrative record that was before the Secretary" when she made her decision. *Kempthorne*, 530 F.3d at 1002. To ensure that we review only

---

[3] The Secretary also asks us to reverse the district court's decision to supplement the 2004 rulemaking record with the OMB draft outlier correction rule. We decline to do so because the district court did not abuse its discretion in partially supplementing the 2004 rulemaking record.

those documents that were before the agency, we "do not allow parties to supplement the record unless they can demonstrate unusual circumstances justifying a departure from this general rule." *Id.* (quotation mark omitted). We have identified three "unusual circumstances":

> (1) the agency deliberately or negligently excluded documents that may have been adverse to its decision; (2) the district court needed to supplement the record with background information in order to determine whether the agency considered all of the relevant factors*;* or (3) the agency failed to explain administrative action so as to frustrate judicial review.

*Id.* (quotation marks, citations and alteration omitted); *see also City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (denying motion to supplement administrative record because "[n]one of these [three] conditions is met").

DHP complains that the district court should have supplemented the administrative record with source data used to approximate cost-to-charge ratios for 2004. But it does not explain—or even *try* to explain—how its request falls into one of the three unusual circumstances elucidated in *Kempthorne*. The Secretary did not frustrate judicial review by saying too little; the 2004 rulemaking explained at length how she calculated cost-to-charge ratios in light of the outlier correction rule. *See* 68 Fed. Reg. at 45,476 (explaining "three steps" used to calculate "updated cost-to-charge ratios"). Nor does the source data constitute critical background information. *See James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1095–96 (D.C. Cir. 1996) (unnecessary to supplement administrative record with underlying source documents because record contained "detailed memoranda describing the [agency's] findings and recommendations"). DHP has also

failed to establish that this source data was deliberately or negligently excluded by the Secretary. Meeting this exception requires a "strong showing of [agency] bad faith" and the "conclusory statements" in DHP's brief "fall far short" of that high threshold. *Id.* at 1095 (quotation mark omitted).

DHP next argues that the district court should have supplemented the administrative record with the "trimmed" version of hospital charge data. Appellants' Br. 55. It says that the trimmed data is different from the "complete data sets" the Secretary provided to the public, which allegedly left it in the dark as to how the Secretary in fact calculated cost-to-charge ratios. *Id.* DHP is wrong: "[T]he process of 'trimming' involved neither the modification of the [data] files currently in the administrative record, nor the creation of new [data] files not in the record." *Dist. Hosp. Partners*, 971 F. Supp. 2d at 25. Moreover, the trimmed files are similar to source data and therefore are neither background information nor material that is needed because the agency failed to explain itself. *See James Madison*, 82 F.3d at 1095–96. Again, DHP makes no showing that the exclusion of the trimmed files was done in bad faith.

DHP's final claim is that the administrative record should have been supplemented with the congressional testimony of a former HHS official.[4] This material also fails to fall within one of *Kempthorne*'s three exceptions. We are not reviewing

---

[4] Although DHP also asserts that the district court should have supplemented the 2005 and 2006 rulemaking records with the OMB draft, its argument on this point consists of only one sentence in its opening brief and is therefore forfeited. *See Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (appellant forfeited argument supported by "only [a] single, conclusory statement" in opening brief).

agency rules that say so little they "frustrate judicial review" and the congressional testimony is not "background information" that illustrates the Secretary's decision-making. *Kempthorne*, 530 F.3d at 1002. Nor was this document excluded in bad faith because it was *not* withheld: As the Secretary points out, the testimony is a "matter of public record." Appellee's Br. 55.

Accordingly, the district court did not abuse its discretion in limiting supplementation to the 2004 rulemaking record with only the draft rule sent to OMB and a 2004 public comment.

## B. USING THE BEST AVAILABLE DATA

DHP asserts that the Secretary was obligated to use the best available data in formulating the outlier thresholds for 2004, 2005 and 2006. While some statutes require an agency to use the best available data when taking certain action,[5] DHP has not identified a similar statute constraining the Secretary's discretion in setting outlier thresholds. DHP also claims that the Secretary herself required the agency to always use the best available data. *See* 65 Fed. Reg. 47,026, 47,038 (Aug. 1, 2000). But she simply noted that she "use[s] the best available cost reporting data" for a specific calculation, *id.*, but did not impose as a freestanding regulatory obligation the use of the best available data in every rulemaking.

---

[5] *See, e.g.*, 16 U.S.C. § 1533(b)(1)(A) (Interior Secretary must use "the best scientific and commercial data available to him" in determining "whether any species is an endangered species or a threatened species"); 42 U.S.C. § 13256(b) (Energy Secretary must prepare "technical and policy analysis" on alternative fuels "based on the best available data and information obtainable by the Secretary").

DHP attempts to resuscitate its claim by arguing that, in *Gas Appliance Manufacturers Ass'n, Inc. v. DOE* (*GAMA*), 998 F.2d 1041 (D.C. Cir. 1993), we imposed a generic obligation on agencies to always use the best available data. DHP is in error. Nowhere in *GAMA* did we require agencies to collect and use only the best available data. Instead, we reversed the Energy Department's decision because it was not adequately explained. *Id.* at 1046–48, 1049–51. We also rejected a specific calculation Energy had made because it did not explain why it used two different data sets for the same inquiry. *Id.* at 1048. But far from imposing a best-available-data obligation on all agencies, *GAMA* was simply a routine APA case in which we found the challenged agency action arbitrary and capricious. *See NRDC v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000).

To be clear, agencies do *not* have free rein to use inaccurate data. An agency is required to "examine *the relevant data* and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added; quotation mark omitted). If an agency fails to examine the relevant data—which examination could reveal, *inter alia*, that the figures being used are erroneous—it has failed to comply with the APA. Moreover, an agency cannot "fail[] to consider an important aspect of the problem" or "offer[] an explanation for its decision that runs counter to the evidence" before it. *Id.* These requirements underscore that an agency cannot *ignore* new and better data. *See Catawba Cnty., NC v. EPA*, 571 F.3d 20, 46 (D.C. Cir. 2009) (agencies "have an obligation to deal with newly acquired evidence in some reasonable fashion"); *see also New Orleans v. SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992) ("an agency's reliance on a report or study without ascertaining the accuracy of the data

contained in the study or the methodology used to collect the data is arbitrary" (quotation mark omitted)).

Whether an agency has arbitrarily used deficient data depends on the specific facts of a particular case, as "the parameters of the arbitrary and capricious standard of review will vary with the context of the case." *WWHT, Inc. v. FCC*, 656 F.2d 807, 817 (D.C. Cir. 1981) (quotation marks omitted); *see also Maggard v. O'Connell*, 671 F.2d 568, 571 (D.C. Cir. 1982) ("the concept of arbitrary and capricious review defies generalized application and must be contextually tailored" (quotation marks omitted)). It is to that inquiry we now turn.

## C. SETTING THE OUTLIER THRESHOLDS

DHP contends that the Secretary acted arbitrarily and capriciously by setting the outlier thresholds too high in 2004, 2005 and 2006. Because the Secretary dealt with different considerations in each rulemaking, we discuss them separately.

### 1. The 2004 Rule

The Secretary established that the 2004 outlier threshold was the applicable DRG rate "plus $31,000." 68 Fed. Reg. at 45,477. As discussed above, the Secretary selected this number by first simulating 2004 outlier payments using data from 2002. *Id*. at 45,476. She inflated the 2002 data using "the 2-year average annual rate of change in charges per case" between 2000 and 2002, which calculation was made from all hospitals' "cost-to-charge ratios." *Id.* And she accounted for the effects of reconciliation by identifying "approximately 50 [turbo-charging] hospitals" that were likely to be reconciled. *Id*. For each of the 50 hospitals, the Secretary sought to

project its "cost-to-charge ratio based on its rate of increase in charges per case" in 2002.[6] *Id*. at 45,477.

DHP argues that the Secretary, in calculating the charge inflation factor, should have excluded the data from the 123 turbo-charging hospitals identified in the NPRM. The Secretary excluded them in the OMB draft rule and DHP faults the Secretary for not explaining why she changed course in the 2004 rulemaking and opted to *include* turbo-chargers' data. But, as already noted, HHS abandoned the OMB draft rule and never published it in the Federal Register. Relying on the OMB draft rule to impugn the 2004 rulemaking, then, presents a problem. The Supreme Court recently iterated that "federal courts ordinarily are empowered to review only an agency's *final* action." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007). Deviations from a

---

[6] At oral argument, counsel for DHP intimated that the charge inflation factor and cost-to-charge ratios come from two different datasets. Oral Arg. Tr. at 11–12, 14–15, 38. Because this data is separate, DHP asserted, the Secretary could make adjustments to one group but not the other. We do not believe the intimation is supported by the record. In each rulemaking, the Secretary specified that she derived the charge inflation factor from the cost-to-charge ratios for individual hospitals. *See* 70 Fed. Reg. at 47,494 (Secretary calculated "a charge inflation factor of 14.94 percent . . . us[ing] updated cost-to-charge ratios from the March 2005 update" of hospital files); 69 Fed. Reg. at 49,277 ("[t]he 1-year average annual rate of change in charges per case . . . was 8.9772 percent, or 18.76 percent over 2 years. As discussed above, *as we have done in the past, we used hospital cost-to-charge ratios*" from hospital files (emphasis added)); 68 Fed. Reg. at 45,476 (charge inflation factor is derived from "the 2-year average annual rate of change in charges per case" and is based on "cost-to-charge ratios" from hospital files). Accordingly, any adjustment to cost-to-charge ratios is reflected in the charge inflation factor.

"preliminary determination" that was subsequently "overruled at a higher level . . . does not render the decisionmaking process arbitrary and capricious." *Id.* It is true, of course, that an agency cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But this principle is inapplicable here—the OMB draft was never "on the books" in the first place. *Id.*

We held as much in *Kennecott Utah Copper Corp. v. DOI*, 88 F.3d 1191 (D.C. Cir. 1996). That case involved, among other things, draft regulations that were sent by a Department of Interior (Interior) official to the Office of the Federal Register (OFR) for publication. *Id.* at 1200. Before they were published, however, Interior switched course and withdrew the draft from publication. *Id.* at 1200–01. Interior then proposed and eventually published a new set of regulations. *Id.* at 1201. Certain *Kennecott* petitioners challenged the published regulations because they supposedly "repealed and modified" the never-published draft regulations without a new round of notice and comment. *Id.* at 1207. We disagreed and held that the published regulations did not "repeal or modify" anything because the draft "never became a binding rule requiring repeal or modification." *Id.* at 1208. The APA requires notice and comment only when "formulating, amending, or repealing a rule," 5 U.S.C. § 551(5), and the "agency was in no sense 'formulating' a rule" by "discarding" the earlier draft, *Kennecott*, 88 F.3d at 1209.

Nevertheless—and without regard to the OMB draft—we believe that the Secretary's promulgation of the 2004 outlier threshold violated the APA. In the NPRM—a formal agency document that was published in the Federal Register—the Secretary identified 123 turbo-charging hospitals. 68 Fed. Reg. at 10,423–24. The 123 hospitals reported adjusted

charges that "increased at a rate at or above the 95th percentile rate of charge increase for all hospitals" between 1999 and 2001. *Id*. at 10,423. The Secretary also noted that the 123 hospitals were the principal beneficiaries of the outlier payment system: Their "mean rate of increase in charges was 70 percent" for that two-year period while their cost-to-charge ratios "declined by only 2 percent." *Id*. at 10,424.

The 123 hospitals are nowhere to be found in the 2004 rulemaking. Granted, the Secretary identified 50 hospitals "that have been consistently overpaid recently for outliers." 68 Fed. Reg. at 45,476. But she did not explain how the 50 hospitals differed from the 123 she identified in the NPRM. This unexplained inconsistency is significant because factoring in the outlier correction rule "resulted in a *substantial* reduction in the outlier threshold from the proposed level." *Id.* at 45,477 (emphasis added). The changes, in fact, caused the actual 2004 fixed loss threshold to fall from $50,200 in the proposed rule to $31,000 in the final rule. *Id.* Had the Secretary accounted for more turbo-charging hospitals in the 2004 rule, perhaps the 2004 outlier threshold would have been even lower. Or perhaps not. Either way, we have no way to know for sure because there was scarcely a word about the 123 turbo-chargers in the 2004 rule.[7]

---

[7] Although the NPRM was not technically part of the 2004 rulemaking record, it was sufficiently similar to, and contemporaneous with, the 2004 rulemaking as to require the Secretary to explain inconsistencies in the data. *See Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (agency must account for and explain changes that affect "a contemporaneous and closely related rulemaking"); *Ala. Power Co. v. FCC*, 773 F.2d 362, 371 (D.C. Cir. 1985) (noting that agency adopted "inconsistent" principles in different but related orders and

Our conclusion follows naturally from the Supreme Court's holding in *State Farm*. There, the Court stated that an agency "must examine *the relevant data* and articulate a *satisfactory explanation for its action* including a rational connection between the facts found and the choice made." 463 U.S. at 43 (emphases added; quotation mark omitted). The Secretary failed to do so here. She identified only 50 turbo-charging hospitals despite that figure being "counter to the evidence" before her, *id.*, namely the 123 hospitals in the NPRM. The inconsistency went unresolved in the 2004 rulemaking because the Secretary never discussed it. We have often declined to affirm an agency decision if there are unexplained inconsistencies in the final rule. *See, e.g.*, *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1182 (D.C. Cir. 1994) (noting that "unexplained inconsistency" in final rule was "not reasonable"); *Gulf Power Co. v. FERC*, 983 F.2d 1095, 1101 (D.C. Cir. 1993) ("[W]hen an agency takes inconsistent positions . . . it must explain its reasoning."); *General Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) (agency action was arbitrary and capricious because its analysis was "internally inconsistent and inadequately explained"). Nor do we uphold agency action if it fails to consider "significant and viable and obvious alternatives." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (quotation marks omitted). The analysis of the 123 turbo-charging hospitals identified in the NPRM was a significant and obvious alternative to the 50 hospitals the Secretary ultimately considered in the 2004 final rule.

The Secretary maintains that she had no obligation to explain the inconsistency given our holding in *Bell Atlantic Telephone Cos. v. FCC*, 79 F.3d 1195 (D.C. Cir. 1996). But

---

remanding to agency for further explanation "[i]n light of this unexplained inconsistency").

our holding there is off point.  In *Bell Atlantic*, the FCC was required by regulations to set a price cap for telephone carriers that included an offset based on "productivity growth" in the telecommunications industry.  *Id*. at 1198.  In a 1990 order, the Commission included data from a controversial study and arrived at a productivity offset that was relatively low.  *See id.* at 1200.  Then, in 1995, the Commission reversed course and excluded the data from that same study, which led to a higher productivity offset.  *Id*. at 1200–01.  We held that it was reasonable for "[o]ne Commission . . . to include a suspicious data point because it was relevant, [and] a later Commission . . . to exclude a relevant data point because it was suspicious." *Id.* at 1203 (first alteration in original).  Neither decision should "be viewed as more rational" than the other.  *Id*.

The same circumstances do not exist here.  In *Bell Atlantic*, the later Commission acknowledged the inclusion of suspect data in the past and explained why it decided to exclude that information in calculating the 1995 price cap.  *Id.* at 1200–03.  In the 2004 rulemaking, however, the Secretary never even *acknowledged* the possibility of excluding the 123 turbo-charging hospitals from the dataset.  Her muteness makes *Bell Atlantic* inapposite.  Indeed, as we explained in that case:  "Everyone agrees that an agency's change of mind does not itself render the agency's action arbitrary.  What matters is the Commission's *explanation for its decision*." *Id*. at 1202 (emphasis added; citations omitted).

The Secretary also claims that our deferential standard of review tilts in favor of upholding the 2004 outlier threshold. We have stated that "in framing the scope of review, the court takes special note of the tremendous complexity of the Medicare statute.  That complexity adds to the deference which is due to the Secretary's decision." *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994).

We do not retreat from that statement. The Secretary's task of collecting and analyzing hospital charge data remains challenging. And when agency decisions "involve complex judgments about sampling methodology and data analysis that are within the agency's technical expertise," they receive "an extreme degree of deference." *Alaska Airlines, Inc. v. TSA*, 588 F.3d 1116, 1120 (D.C. Cir. 2009). But our deference "is not unlimited" and we will remand to the agency if it fails to apply its "expertise in a reasoned manner." *Cape Cod Hosp.*, 630 F.3d at 206.

Having decided that the Secretary's explanation is insufficient, the question becomes one of remedy. "If the record before the agency does not support the agency action . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). We have likewise held that "bedrock principles of administrative law preclude us from declaring definitively that [the Secretary's] decision was arbitrary and capricious without first affording her an opportunity to articulate, if possible, a better explanation." *Cnty. of L.A.*, 192 F.3d at 1023; *see also New York v. Reilly*, 969 F.2d 1147, 1153 (D.C. Cir. 1992) (remanding "for more reasoned decisionmaking" because agency failed to "adequately explain" its final rule). We follow that well-worn path here and remand to the Secretary for additional explanation. On remand, the Secretary should explain why she corrected for only 50 turbo-charging hospitals in the 2004 rulemaking rather than for the 123 she had identified in the NPRM. She should also explain what additional measures (if any) were taken to account for the distorting effect that turbo-charging hospitals had on the dataset for the 2004 rulemaking. And if she decides that it is appropriate to recalculate the 2004 outlier threshold, she should also decide what effect (if any) the

recalculation has on the 2005 and 2006 outlier and fixed loss thresholds.

## 2. The 2005 Rule

The Secretary set the 2005 outlier threshold as the applicable DRG rate "plus $25,800." 69 Fed. Reg. at 49,278. In arriving at this number, she considered the suggestions of numerous commenters and ultimately adopted a methodology in the final rule that was different from that in the proposed rule. *Id*. at 49,277. The Secretary said that she had to use more recent data to address both the outlier correction rule and the "exceptionally high rate of hospital charge inflation that is reflected in the data for [fiscal years] 2001, 2002, and 2003." *Id*. Although the data in the revised methodology was more recent, it still had to be inflated to accurately predict charges for 2005. *Id.* Instead of using the "2-year average annual rate of change in charges per case," the Secretary took "the unprecedented step of using the first half-year of data from [fiscal year] 2003 and comparing this data to the first half year of data for [fiscal year] 2004." *Id.*

The Secretary's methodology in the 2005 rulemaking obviated any need to eliminate the turbo-charging hospitals from her dataset. She opted to use the most recent cost-to-charge ratios in calculating the 2005 charge inflation factor, half of which were from the "first half year of data for [fiscal year] 2004." *Id*. This data came *after* the effective date of the outlier correction rule; it was not infected by turbo-charging because the outlier correction rule had by then corrected the flaw in the outlier payment system that created the opportunity—and incentive—to turbo-charge. *See id.* at 49,278; *see also supra* pp. 7–8. The ratios were therefore based on "either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest

cost reporting period." 42 C.F.R. § 412.84(i)(2). This data was "more recent" than previous data used by the Secretary. 69 Fed. Reg. at 49,278. Her revised methodology, she believed, would "account for the[] changes" resulting from the outlier correction rule. *Id*. at 49,277.

It is true that the data from the "first half-year" of 2003 was affected by turbo-charging. *Id.* But it makes little sense to remove turbo-charging hospitals from this half of the dataset without making similar adjustments to the other half of the dataset (*i.e.*, the first half-year of data from fiscal year 2004). As discussed, there was no need to modify the 2004 data because that information was collected while the outlier correction rule was in effect. With no need to change the 2004 data, the Secretary reasonably left both halves unaltered. *See id*. (stating that it is "optimal to employ comparable periods in determining the rate of change from one year to the next"). Indeed, if the Secretary had removed turbo-chargers from the 2003 dataset, she would have had to project how that decision affected the 2004 dataset. If that projection indicated significant effects, she would have had to undertake further statistical adjustments and perhaps remove hospitals from the 2004 dataset. The Secretary sensibly opted for a simpler approach that did not entail piling projections atop projections. *See id.* (noting her preference "to employ actual data rather than projections in estimating the outlier threshold because we employ actual data in updating charges[] themselves"); *see also Ashland Exploration, Inc. v. FERC*, 631 F.2d 817, 822 (D.C. Cir. 1980) (agencies "may rationally turn to simplicity . . . and administrative convenience").

Moreover, even if this dataset was less than perfect, imperfection alone does not amount to arbitrary decision-making. *See, e.g.*, *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1248 (D.C. Cir. 2014) (agency's

"data-collection process was reasonable, even if it may not have resulted in a perfect dataset"); *In re Polar Bear ESA Listing*, 709 F.3d 1, 13 (D.C. Cir. 2013) ("That a model is limited or imperfect is not, in itself, a reason to remand agency decisions based upon it."); *Allied Local and Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 71 (D.C. Cir. 2000) ("[w]e generally defer to an agency's decision to proceed on the basis of imperfect scientific information"); *North Carolina v. FERC*, 112 F.3d 1175, 1190 (D.C. Cir. 1997) ("The mere fact that the Commission relied on necessarily imperfect information . . . does not render [its decision] arbitrary."); *Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994) (agency may nonetheless use model "even when faced with data indicating that it is not a perfect fit"). This precedent further supports the Secretary's conclusion that removing turbo-charging hospitals from both datasets in the 2005 rulemaking was not a "significant and viable and obvious alternative[]." *Nat'l Shooting Sports Found.*, 716 F.3d at 215 (quotation marks omitted).

DHP claims that our holding in *County of Los Angeles* supports its argument. We disagree. In pertinent part, we held there that the Secretary's 1985 and 1986 outlier thresholds were arbitrary and capricious. 192 F.3d at 1021–23. To set the thresholds, the Secretary used data that was collected when hospitals were still reimbursed based on the reasonable cost of their services rather than the average cost of treatment. *Id.* at 1020. She did so even though she had a wealth of readily available data collected under the new average-cost-of-treatment regime. *Id.* at 1021. The more recent data, unlike the older numbers, also accounted for a downward "trend" in outlier payments that was caused by the new reimbursement scheme. *Id.* The Secretary nevertheless concluded that "there [was] *no evidence* to suggest that total outlier payments" decreased under the new system. *Id.* We

held that her failure to account for the contrary evidence in the record—as well as her refusal to use more recent data—were arbitrary and capricious actions. *Id*. at 1023.

Here, by contrast, the Secretary did not reject a more recent dataset; she stated time and again that the revised methodology "use[d] the most recent charge data available." 69 Fed. Reg. at 49,277. She also stated that the revised methodology for calculating the 2005 outlier threshold "address[ed] both the changes to the outlier payment methodology and the exceptionally high rate of hospital charge inflation" between 2001 and 2003. *Id*. Thus, unlike in *County of Los Angeles*, the Secretary here used the most recent data that accounted for the outlier correction rule's effects. Accordingly, we reject DHP's APA challenge to the 2005 outlier threshold.

### 3.  The 2006 Rule

We need not linger with this rulemaking because the 2006 outlier threshold was plainly reasonable. The Secretary set it at the applicable DRG rate "plus $23,600." 70 Fed. Reg. at 47,494. She settled on $23,600 by simulating 2006 payments using a charge inflation factor. *Id*. The data used to compute this factor was taken—as in the earlier rules—from "updated cost-to-charge ratios" included in "the most recent tentatively settled cost reports of hospitals." *Id*. With this data in hand, the Secretary compared charges from the "first six months of [fiscal year] 2005 relative to [the] same period for [fiscal year] 2004." *Id*. Importantly, the Secretary noted that the entire period (*i.e.*, both six-month sets) occurred while the outlier correction rule was in effect. *Id*.

Because all of the charge data for the 2006 rule was collected with the outlier correction rule in effect, the specter of turbo-charging was nil. Indeed, the Secretary noted in the

2006 rulemaking that the outlier correction rule worked as predicted: "The actual rate of charge inflation subsided significantly in [fiscal year] 2004 after we made significant changes to our outlier policy." *Id.* In other words, "hospitals changed their charging practices as a result" of the outlier correction rule. *Id.* The Secretary reasonably weighed the evidence and concluded that there was no need to account for turbo-chargers because turbo-charging was no longer occurring. *See El Conejo Americano of Texas, Inc. v. DOT*, 278 F.3d 17, 20 (D.C. Cir. 2002) (courts do not "reweigh the evidence" if agency's "conclusion was reasonable"). And, to state the obvious, excluding data from those hospitals was neither a significant nor an obvious alternative the Secretary had to consider. *See Nat'l Shooting Sports Found.*, 716 F.3d at 215–16.

We are perplexed by DHP's objection to the 2006 outlier threshold. DHP cites favorably a comment submitted during the 2006 rulemaking that advocated a fixed loss threshold of $24,050, using the methodology the Secretary in fact employed. Moreover, at oral argument, DHP's counsel suggested that the fixed loss threshold for 2006 should have been in the "low twenties." Oral Arg. Tr. at 35–36. That is exactly where it ended up: $23,600. 70 Fed. Reg. at 47,494. Accordingly, we conclude that the Secretary's calculation of the 2006 fixed loss threshold was neither arbitrary nor capricious.

For the foregoing reasons, we affirm the district court's partial supplementation of the 2004 rulemaking record and its rejection of the APA challenges to the 2005 and 2006 outlier thresholds. We reverse its ruling upholding the 2004 outlier threshold because that threshold is inadequately explained and remand to the district court with instructions to remand the

2004 rule to the Secretary for further proceedings consistent with this opinion.

*So ordered.*